In The
# United States Court of Appeals
### For The Fourth Circuit

## BRIAN COLBERT,

*Plaintiff – Appellant,*

**and**

## MICHAEL RUNNELS; DONNA RUNNELS,

*Plaintiffs,*

**v.**

## NORCOLD, INC.; THETFORD CORPORATION; THE DYSON-KISSNER-MORAN CORPORATION,

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA**

———————

## OPENING BRIEF OF PLAINTIFF-APPELLANT

———————

Bradley L. Leger
Kassi Dee Patrick Marks
LEGER KETCHUM & COHOON, PLLC
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
(832) 764-7200

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. **17-1419**          Caption: Brian Colbert v. Norcold, Inc., et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Brian Colbert

(name of party/amicus)

who is            Appellant            , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Bradley L. Leger    Date:    4/18/17

Counsel for: Brian Colbert, Appellant

## CERTIFICATE OF SERVICE
**************************

I certify that on ___April 18, 2017___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Martin A. Conn, Esq.
Laura May Hooe, Esq.
Lisa Moran McMurdo
Moran Reeves & Conn PC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219

/s/ Bradley L. Leger    4/18/17
(signature)    (date)

Print    Save    Reset Form

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

STATEMENT OF SUBJECT MATTER AND JURISDICTION .................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................1

STATEMENT OF THE CASE..........................................................................2

STATEMENT OF FACTS .................................................................................3

SUMMARY OF THE ARGUMENT ............................................................11

STANDARD OF REVIEW .............................................................................14

    A.    Standard of Review on Appeal of Summary Judgment ...........14

    B.    Legal Standard for Summary Judgment
        of a Products Liability Claim ...................................................17

ARGUMENT .....................................................................................................17

    I.    The Trial Court Erred in Not Following and Properly
        Applying the Standard of Review and in Dismissing
        Colbert's Negligence Claims ...................................................17

        A.    *The Fireman's Rule* .......................................................18

            1.    The Fireman's Rule
                *before* Its Amendment .........................................18

            2.    The Fireman's Rule
                *after* Its Amendment; Applies Retroactively .......27

        B.    *Negligence Based on Design Defect* ..............................32

        C.    *Negligence Based on Failure to Warn* ...........................38

          1.    Colbert Pleaded a Claim
                for Failure to Warn ...............................................38

          2.    Defendants Did Not Seek Summary Judgment
                on Colbert's Failure to Warn Claim ....................39

          3.    Even if Defendants Sought Summary Judgment
                on Colbert's Failure to Warn Claim, the Trial
                Court Erred in Applying the Fireman's Rule:
                There Was Willful and Wanton Conduct ............43

          4.    Gross Negligence Exception
                to the Fireman's Rule Met ...................................45

    II.   The Trial Court Erred in Not Following and Properly
        Applying the Standard of Review and in Dismissing
        Colbert's Breach of Implied Warranty of Merchantability
        Claim .......................................................................46

        A.    *Defendants Did Not Seek Summary Judgment*
              *on Colbert's Breach of Warranty Claim* .......................46

        B.    *Colbert Was "Affected by" the Product* ........................46

        C.    *If the Fireman's Rule Applies, the Willful*
               *and Wanton Exception Also Applies* ..............................49

        D.    *The Fireman's Rule Was Amended,*
               *There Was Gross Negligence* .........................................50

CONCLUSION ............................................................50

STATEMENT REGARDING ORAL ARGUMENT ..................51

CERTIFICATE OF COMPLIANCE ...........................................52

CERTIFICATE OF SERVICE ....................................................53

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Advanced Marine Enterprises, Inc. v. PRC, Inc.*,
　　256 Va. 106 (1998) ............................................................44

*Alexander v. Stokes*,
　　2002 U.S. Dist. LEXIS 176 (N.D. Tex. 2002) ...................15

*Alfonso v. Robinson*,
　　257 Va. 540 (1999) ............................................................25

*Anderson v. Liberty Lobby, Inc.*,
　　477 U.S. 242 (1986) ....................................................15, 16

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009) ...........................................................38

*Baughman v. General Motors Corp.*,
　　627 F.Supp. 871 (D.N.C. 1985)..........................................17

*Bell Atlantic Corp. v. Twombly*,
　　550 U.S. 544 (2007) ...........................................................38

*BNLFood Investments Limited SARL v.*
　　*DSM Nutritional Products, LLC*,
　　2014 WL 1003844 (D. Md. 2014).................................40-43

*Boward v. Leftwich*,
　　197 Va. 227 (1955) ............................................................24

*Bradford v. HSBC Mortgage Corp.*,
　　799 F.Supp.2d 625 (E.D. Va. 2011) ...................................40

*Brosville Community Fire Dept., Inc. v. Navistar, Inc.*,
　　2014 WL 7180791 (W.D. Va. 2014) ................................ 33-34, 39-40

*Brown v. Mitchell*,
    327 F.Supp.2d 615 (E.D. Va. 2004) .............................................41, 42

*Buettner v. R.W. Martin & Sons, Inc.*,
    47 F.3d 116 (4th Cir. 1995) ..............................................................47

*Carlson v. General Motors Corp.*,
    883 F.2d 287 (4th Cir. 1989) ........................................................47-48

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .........................................................................15

*C.H. ex rel. Hardwick v. Heyward*,
    404 F. App'x 765 (4th Cir. 2010) ......................................................42

*Crouse v. Medical Facilities*,
    86 Va. Cir. 168 (2013) ......................................................................25

*Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*,
    2007 WL 4526618 (E.D.N.Y. 2007) ..................................................42

*Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*,
    264 F.3d 424 (4th Cir. 2001) .......................................................14, 15

*Elliott v. Carter*,
    791 S.E.2d 730 (2016) .................................................................31, 32

*Ferguson v. Ferguson*,
    212 Va. 86 (1971) .............................................................................31

*First Virginia Bank-Colonial v. Baker*,
    225 Va. 72, 81 (1983) .......................................................................29

*Fletcher v. Tarasidis*,
    219 Va. 658 (1979) ......................................................................30, 32

*Foglia v. Clapper*,
    2012 WL 777492 (E.D. Va. Mar. 7, 2012).........................................24

*Fravel v. Ford Motor Co.,*
    973 F.Supp.2d 651 (W.D. Va. 2013) ........................................23-24, 26

*General Motors v. Lupica,*
    237 Va. 516 (1989) ...........................................................................37

*Goodwin v. Hare,*
    246 Va. 402 (1993) .......................................................................18-19

*Green v. Ingram,*
    269 Va. 281 (2005) .....................................................................24, 31

*Greene v. Consol. Freightways Corp. of Delaware,*
    74 F.Supp.2d 616 (E.D. Va. 1999) .........................................19, 20-22

*Holiday Motor Corp. v. Walters,*
    292 Va. 461 (2016) .......................................................................49-50

*Hudgins v. Holman,*
    49 Va. Cir. 279 (1999) ..................................................................19-20

*Huffman v. Love,*
    245 Va. 311 (1993) .......................................................................24-25

*Infant C. v. Boy Scouts of America, Inc.,*
    239 Va. 572 (1990) .....................................................................24, 31

*Johnson v. City of Shelby,*
    135 S.Ct. 346 (2014)....................................................................38-39

*Jones v. New York City Health & Hosp. Corp.,*
    2003 WL 21262087 (S.D.N.Y. 2003) ...............................................41

*Joseph v. Lowery,*
    261 Or. 545, 550 (1972) ...................................................................29

*Krauth v. Geller,*
    31 N.J. 270 (1960) ...........................................................................27

*Lockhart v. Coastal Coal Co., LLC*,
    2003 WL 22097984 (W.D. Va. 2003) ....................................16, 23, 27

*Logan v. Montgomery Ward & Co., Inc.*,
    216 Va. 425 (1975) ............................................................................33

*Matthews v. Ford Motor Co.*,
    479 F.2d 399 (4th Cir. 1973). ............................................................48

*Reeves v. Sanderson Plumbing Products*,
    530 U.S. 133 (2000) ...........................................................................15

*Rogers v. Dow Agrosciences, LLC*,
    2006 WL 3147393 (W.D. Va. 2006) ..................................................44

*Ruiz v. Mero,*
    189 N.J. 525 (2007) ...........................................................................27

*Sawyer v. C.L. Pincus, Jr. & Co., Inc.*,
    83 Va. Cir. 251 (2011) .......................................................................23

*Sayegh v. The Raymond Corp.*,
    2016 WL 6477008 (W.D. Va. Nov. 1, 2016) ....................................24

*Schiff v. San Francisco,*
    816 F.Supp.2d 798 (N.D. Cal. 2011).................................................16

*Sheppard v. Monsanto Co.*,
    2016 WL 3629074 (D. Hawaii 2016) ................................................39

*Shiflet v. Eller*,
    228 Va. 115 (1984) ............................................................................29

*Sutherlin v. Lowe's Home Centers, LLC*,
    2014 WL 4748530 (E.D. Va. 2014) ..................................................47

*Tunnell v. Ford Motor Co.*,
    2004 WL 1798364 (W.D. Va. 2004). .............................................35-37

*Turner v. Manning, Maxwell & Moore, Inc.*,
216 Va. 245 (1975) ...............................................................36

*Young v. J.I. Case*,
1994 WL 506403 (E.D. Va. 1991) ...............................................17, 48

*Woods v. Mendez*,
265 Va. 68 (2003) .............................................................23-24

## **Rules**

Fed. R. Civ. P. 8(a)(2), (3), (d)(1), (e) ...........................................38

Fed. R. Civ. P. 15(a)(2) ...........................................................38

Fed. R. Civ. P. 56(a) ...........................................................15,

Fed. R. Civ. P. 56(c) ...........................................................15

## **Statutes**

28 U.S.C. § 1332(a)(1).............................................................1

28 U.S.C. §1291 ...............................................................1

2017 Virginia Laws Ch. 315 (H.B. 1590)...............................................27-28

Va. Stat. § 8.01-1 ...........................................................28, 29

Va. Stat. §8.01-226. ...........................................................18

Va. Stat. § 8.2-318 ...........................................................2, 46-47, 48

Va. Stat. § 8.2-719 ...........................................................48

Va. Stat. §8.2-715(2)(b) ...........................................................48

## **Other Authorities**

5 Wright & Miller § 1219 ...........................................................38

2010 Notes of the Advisory Committee, ¶1 ...................................................15

BLACK'S LAW DICTIONARY. 189 (Pocket ed. 1996) .....................................21

Bill Tracking Information HB 1590, 2017 Session ......................................28

Va. Model Jury Instructions (Civil) § 34.076 (2014) ...................................40

# STATEMENT OF SUBJECT MATTER AND JURISDICTION

This is an appeal from a summary judgment of the United States District Court for the Eastern District of Virginia in a products liability and personal injury lawsuit. The District Court had subject matter jurisdiction on the basis of diversity under 28 U.S.C. § 1332(a)(1). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

The District Court entered its final order on March 3, 2017, granting Defendants' motion for summary judgment as to all remaining claims in the lawsuit. (JA 2050-2051). The District Court then detailed the reasons for that decision in a Memorandum Opinion filed March 24, 2017. (JA 2052-2072). Appellant, Brian Colbert (hereinafter "Colbert") timely filed his Notice of Appeal with the District Clerk on March 31, 2017, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). (JA 2073-2074).

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the Trial Court erred in failing to follow the proper standard of review when it weighed the evidence and dismissed all of Colbert's claims based on the blanket application of the Fireman's Rule without considering the entire record and rule as to whether there was a genuine issue of material fact as to willful and wanton conduct applicable to each claim.

2.      Whether the amendment to the Fireman's Rule providing for an exception for gross negligence applies to this case.

3.      Whether the Trial Court erred in dismissing Colbert's failure to warn and breach of warranty claims when summary judgment was not sought on those bases by Defendants for Colbert's claims.

4.      Whether the court erred in dismissing Colbert's breach of implied warranty of merchantability claim on the basis of him not being a user or beneficiary of the defective product without considering the "affected by the goods" language in Va. Code § 8.2-318.

## STATEMENT OF THE CASE

Colbert, both a Sheriff's Deputy and volunteer Firefighter, while in his capacity as a Deputy, was injured in a fire caused by a defective, Norcold gas absorption refrigerator installed in the Runnels' RV. Although recalled and retrofitted, it remained a fire hazard as it continued to leak highly flammable hydrogen gas due to internal corrosion which was not addressed, nor intended to be addressed, by the retrofit. Neither the Runnels, nor anyone else in America, including first responders, were ever warned that after the recall the refrigerators would continue to corrode from within ultimately causing highly flammable hydrogen gas to leak and create the risk of explosion and fire.

The retrofit in the recall notice the Runnels received in 2012 was a High Temperature Sensor ("HTS") and ineffective to remedy the nature of the defect, corrosion, and leaking highly flammable hydrogen gas. It was designed only to shut the refrigerator down if it reached a certain temperature in the hope that one of many potential ignition sources would be eliminated. Defendants knew but never warned anyone that the recall was ineffective to remedy the actual defect. The refrigerator was a ticking time bomb that caused a fire which destroyed most of the Runnels' property[1] and caused catastrophic injuries to Colbert.

The parties filed Motions for Summary Judgment which were heard on February 24, 2017. (JA 2000-2049). The Court dismissed all of Colbert's claims based on the Fireman's Rule as it existed at that time and Colbert timely filed his appeal. (JA 2050-2074).

## STATEMENT OF FACTS

The Runnels owned a 2005 Winnebago Adventurer Workhorse ("RV") equipped with a Norcold 1200 Series refrigerator. (JA 907:5-6). On August 2, 2015, Mr. Runnels, in preparation for taking a trip in the RV, turned on the refrigerator, left the RV to go into his home, and shortly thereafter saw smoke coming from the RV. (JA 930-941). He went to the RV, opened the door, and saw flames coming

---

[1] The Runnels were the original Plaintiffs in this case but Defendants settled their claims and the case dismissed. (JA 18, DE 157).

from the refrigerator first before anything else. (JA 935:6-8; 940:9-11). The fire spread quickly and ultimately consumed the entire RV, the entire Runnels home, and almost all of their personal property. (JA 941:2-10, 15-17; 942:9-12; 943:2-6; 947:11-18). Colbert, a Sheriff's Deputy and volunteer firefighter, responded to the fire. (JA 954:3-11). While on the scene, he was struck in the arm with a piece of shrapnel and suffered severe injuries. (JA 955:7-959:20; 962:5-963:18; 964:1-9).

Norcold[2] admitted[3] that it has a duty to design and manufacture safe refrigerators. (JA 1012:19-24). Thetford and DKM[4] (hereinafter "Thetford/DKM") admitted they have a duty to manufacture safe refrigerators. (JA 1136:12-15). Thetford/DKM admitted that "the design of a refrigerator that allows highly flammable gas to leak…is faulty" and is "a defect obviously" and "is not safe…in any situation." (JA 1079:10-18; 1080:15-18). Norcold admitted that refrigerators that catch fire are not safe. (JA 1012:5-10). Pressure testing done of the boiler tube of the refrigerator in this case revealed that it was leaking, which all three Defendants

---

[2] Norcold is wholly owned by Thetford and Thetford is wholly owned by DKM. (JA 1149:16-19). Norcold designed, manufactured, and marketed the refrigerator. (JA 1012:1-4; JA 1136:5-7). Defendants Thetford and DKM filed a Motion for Summary Judgment on their Alter Ego defenses, but the Court did not rule on it. (JA 15, DE 125-126). Defendants collectively filed the Motion for Summary Judgment on liability. (JA 14, DE 119-120).

[3] Norcold was deposed through a Federal Rule of Civil Procedure 30(b)(6) deposition and designated Eric W. Klein and J. David Roberts as its Corporate Representatives. (JA 968:6-15; 1019:19-22).

[4] Thetford/DKM were deposed through a Rule 30(b)(6) deposition and designated Michael Harris as their joint Corporate Representative. (JA 1067:17-20).

admitted means it is defective. (JA 971:19-972:2; 1020:22-1021:4; 1021:20-1022:1; 1058:4-8; 1140:16-22; 1141:13-21).

Thetford/DKM made and continue to make decisions as to whether or not a recall should be issued on Norcold refrigerators. (JA 1150:15-19). There have been seven recalls issued by Norcold for refrigerator defects; the refrigerator at issue was subject to the **last recall Norcold issued in October of 2010**, NHTSA No. 10E-049. (JA 1180; 969:2-6; 975:20-976:5; 1032:15-18; 1074:4-7). The Runnels' received their only recall notice for their refrigerator in **October of 2012**, two days after which Mr. Runnels had it repaired pursuant to the recall notice.[5] (JA 912:22-913:5; 1181).

**Norcold and Thetford/DKM admitted the "defect is a fatigue failure of corrosion in the boiler tube of the refrigerator that leaks hydrogen gas."** (JA 969:7-10; 970:11-19; 1058:16-23s; 1074:8-13). Norcold admitted this is a defect. (JA 973:14-974:4). All Defendants admitted that "despite several previous recalls issued performed [sic] by Norcold, its refrigerators still pose a risk of injury or death due to fire." (JA 969:11-15; 975:12-16; 987:8-24; 1058:22-23; 1075:14-21). **Norcold admitted that it has done nothing to prevent the corrosion and leaking**

---

[5] In May of 2015, the Runnels took their RV to a race in Talladega. (JA 920:10-13; 923:7-19; 924:4-7, 10-11, 17-20; 924:17-925:1). The refrigerator stopped cooling and Mr. Runnels called a technician who represented to Mr. Runnels he was a certified Norcold technician, who replaced a fuse in the refrigerator, unrelated to the defect allegations in this case. (JA 1185-1186). It worked without performance issues until the fire on August 2, 2015. (JA 926:3-11).

**of highly flammable gas from its refrigerators because it has never addressed the root cause.** (JA 977:7-16; 988:19-24; 1061:17-23). Norcold admitted that "despite knowing about the corrosion and leaking of flammable gas since 1996…and despite issuing seven recalls, the latest being the 2010 recall…Norcold has never issued a recall that stops the corrosion and leaking of highly flammable gas in its refrigerators." (JA 979:11-22; 981:20-25; 984:6-12; 985:5-12; 986:7-13; 989:3-9; 990:23-991:7; 991:23-992:17; 993:8-994:13; 1009:24-1011:21; 1400:6-13; 1401:14-20; 1404:17-23).

Thetford/DKM admitted that "Norcold was aware, Thetford was aware, DKM was aware in the year 2000 and [sic] some of its refrigerators had a defect in which highly flammable hydrogen gas could be expelled, leak and that could cause a fire." (JA 1078:23-1079:2; 1104:18-21). Thetford/DKM admitted that "out of all the recalls that were issued by the defendants, not a single one addressed preventing corrosion and leaking of highly flammable gas in the boiler tubes" and that "defendants…never did anything to try to stop that corrosion and leaking of flammable gas in the boiler tubes of Norcold refrigerators." (JA 1082:17-21; 1083:5-11). Thetford/DKM admitted that none of the Defendants issued a recall to address the root cause of the defect, despite seven recalls, and knowing the potential is still there for leaks. (JA 1084:23-1085:4; 1105:8-17; 1108:24-1109:7; 1110:17-23; 1111:14-20).

At the time the Runnels received their recall notice in 2012, Norcold knew that the HTS did not prevent the refrigerator's cooling unit from corrosion or leaking highly flammable gas. (JA 995:16-996:3; 1405:9-20; 1410:12-23; 1431:20-1432:2; 1438:24-1439:8). Thetford/DKM admitted the same. (JA 1097:13-14; 1106:14-18; 1112:3-14; 1116:6-18). The risk of fire, explosion, injury, and death remained even after the recall work was performed. (JA 997:2-12).

**<u>Norcold admitted that the recall this refrigerator was subject to did not prevent the defect, the corrosion and leaking of highly flammable gases and it has not issued another recall that addresses the defect.</u>** (JA 978:2-7; 1406:9-14). Thetford/DKM admitted that the HTS was not designed to stop all ignition sources from igniting the leaking flammable gases. (JA 1097:10-12; 1097:17-25; 1142:25-1143:5).

Norcold admitted that it has received "hundreds of complaints of fires after its latest recall, the HTS recall, was performed on its refrigerators." (JA 1406:19-25; 1421:10-16; 1438:2-15). Norcold admitted that since 2010, since the last recall, there have been over a thousand reports of leaks in its refrigerators. (JA 1423:3-12). Norcold admitted that fires have occurred due to ignition of fugitive gas leaking from its refrigerators. (JA 1436:1-4). Thetford/DKM admitted that there have been fires after the HTS was installed and that the HTS does not stop fires from occurring. (JA 1098:1-3, 14-15). All three Defendants admitted that claims (one to five) continue

to come to them weekly involving their refrigerator. (JA 1136:20-1137:1; 1408:17-1409:3).

**Norcold admitted that after the HTS recall in 2010, despite knowing that fires are still occurring after the recall work, it has not done anything to try to stop the corrosion and leaking of highly flammable gas.** (JA 1411:3-13). **Thetford/DKM admitted that the goal of preventing fires with the HTS was not met and fires can still occur even with a properly installed, non-bypassed HTS.** (JA 1131:6-13; 1132:5-12; 1143:6-10). Norcold admitted that it has paid millions of dollars in claims related to boiler tube defects in its refrigerators. (JA 1418:24-1419:4). Thetford/DKM admitted that Norcold settled a class action lawsuit for $36 Million based on the same defects as those alleged here. (JA 1146:9-23).

All three Defendants admitted that hydrogen, one of the gases that leaks from the Norcold refrigerators, is colorless, odorless, tasteless, extremely flammable, combustible, and has been classified by OSHA as hazardous. (JA 980:12-18; 984:1-12; 985:18-25; 1086:21-1087:2; 1087:12-15; 1090:2-8; 1090:12-15; 1116:19-24; 1395:20-1396:1; 1437:2-6; 1439:9-12). It is undetectable by people. (JA 980:23-981:18). Hydrogen is particularly prone to leaking and can autoignite. (JA 982:6-9; 1117:24-1118:1). Thetford/DKM admitted that a cooling unit that corrodes and leaks poses a risk of fire. (JA 1439:20-23). All Defendants admitted that leaking highly flammable gases (including in a family RV) is dangerous and poses a safety hazard.

(JA 982:20-983:25; 1125:2-10; 1437:7-12). Norcold admitted that the leaking of highly flammable hydrogen gas could result in death. (JA 1420:21-1421:1). Thetford/DKM admitted that there are numerous potential ignition sources for hydrogen and that a fire and explosion could still occur even with the HTS installed because hydrogen has many ignition sources. (JA 1092:12-19; 1093:8-12; 1093:25-1094:2; 1094:7-1095:9; 1095:17-23; 1096:17-19; 1117:17-23). Norcold admitted that at least one death was caused by its N8 model, which it admits is substantially similar to the 1200 series, and suffers from the same defect. (JA 1424:18-1425:1). Norcold "agrees that the risk of explosion, fire, and suffocation are terribly great risks." (JA 1431:20-1432:1; 1436:5-1437:16). Norcold agreed that "[a] fire ignited by hydrogen can spread quickly through a refrigerator compartment." (JA 1437:13-16).

Further, Norcold testified that "…Norcold had knowledge and was conscious of the fact that prior to and at the time of the recall work that was performed in this case, the recall did not prevent corrosion and flammable gas from leaking." (JA 998:3-11). "…[w]hen Norcold issue this recall in 2010, it knew that the recall work would not prevent corrosion and flammable gas from leaking." (JA 998:13-19). Thetford/DKM admitted: "The *Defendants* were conscious and knew in 2010 when *they* issued the HTS recall that the recall would not stop the corrosion and leaking of highly flammable gas in Norcold refrigerators." (JA 1121:18-22).

Defendants admitted that they all knew of a safer alternative design. Just prior to issuing the last ineffective recall in 2010, Norcold's own head of engineering, Bob Cutright, made a number of recommendations to all three Defendants of ways to prevent the cause of the defect, such as thicker boiler tubes and stronger metal, that Norcold did not implement. (JA 999:5-1000:8; 1113:19-25; 1124:5-15; 1429:11-18). In 2005 Norcold commissioned a study of the defect which recommended thicker boiler tubes which Norcold did not implement. (JA 1007:23-1008:6). The 2005 study also recommended using a stronger metal, which Norcold did not implement. (JA 1011:7-21). All three Defendants admitted that the 2010 recall was cheaper but ineffective. (JA 1009:13-1011:21; 1133:18-25; 1134:1-3; 1429:20-1430:6; 1430:21-1431:4). Thetford/DKM testified that "[t]hey [Thetford/DKM] came up with the safety device to put on the refrigerator" which was a precursor to the HTS and just as ineffective. (JA 1107:1-12). Thetford/DKM knew the root cause of the defect prior to issuing the 2010 recall, but did nothing in that recall to prevent corrosion and leaking of highly flammable gas. (JA 1122:20-23; 1123:6-9). All three Defendants admitted that in 2012 the 1200 Series refrigerator was redesigned to include, among other things, thicker boiler tubes, but they did not notify existing customers that a safer design existed. (JA 1151:6-11; 1426:23-1427:13). They also did not make this new design any sort of recall or offer it to existing customers. (*Id*.) Norcold admitted that the redesign only cost ninety-eight cents. (JA 1006:11-18).

**Norcold admitted that it knew but did not warn its customers in its recall notice, or in any other way, at any time, that even after having the recall work performed, the refrigerators still had the safety risk of corrosion and leaking highly flammable gas.** (JA 1001:25-1002:24; 1015:16-20; 1046:20-1047:16). **All Defendants admitted they have never warned their customers that fires were still occurring after the recall work described in the 2010 recall notice was performed.** (JA 1003:25-1004:6; 1047:3-16; 1127:9-13). Norcold has never told its customers that it knew of a safer design that could prevent corrosion and leaking. (JA 1056:19-24). **All Defendants admitted that they told its customers that the refrigerators were "safe" after the HTS was installed per the recall, knowing that the recall was ineffective.** (JA 1005:3-8; 1051:17-24; 1128:20-1129:11).

**Thetford/DKM admitted that they have never warned their "customers and the American public that its refrigerators still pose a safety risk because the latest HTS recall does not prevent corrosion of [*sic*] leaking flammable gas" or the remaining safety hazards that the HTS does not address.** (JA 1126:8-1127:13).

## SUMMARY OF THE ARGUMENT

This is a textbook case where the willful and wanton exception to the Fireman's Rule should apply under the prior statute and certainly a case where the gross negligence exception should apply under the amended statute so that Colbert

can obtain redress for his injuries – not from the Virginia taxpayers – but from the entities which proximately caused his injuries: Norcold, Thetford, and DKM.

The District Court erred in granting summary judgment in this case on Colbert's negligence claim**s** (design defect and failure to warn) and breach of implied warranty claim by misapplying the Fireman's Rule. The District Court failed to consider the entire record to determine whether there was a fact issue as to whether Defendants engaged in willful and wanton conduct which would be an exception to it under the former statute to the extent the Fireman's Rule applies to each claim. The District Court focused on a few disputed facts, ignored others, and determined that "…Plaintiff has not met the high bar of 'willful and wanton' conduct that would remove this case from the 50-year old precedent of the Fireman's Rule." (JA 2071-2072).

The District Court erred by dismissing Colbert's failure to warn claim when Defendants did not seek summary judgment on that it. Defendants briefed only the safer alternative design element of the defective design negligence claim. Defendants' briefing was silent as to failure to warn until its Reply where it then said that it was seeking summary judgment globally on all negligence. But the summary judgment burden on the movant is to set forth the element or elements which it contends the non-movant lacks sufficient evidence. Design defect and failure to warn negligence claims have different elements. Defendants also argued that failure to

warn was not pleaded, which is incorrect. The District Court chose not to decide this issue and found in a footnote that such was unnecessary because the Fireman's Rule applied anyway without considering the evidence of willful and wanton conduct specific to failure to warn.

It is an admitted, undisputed fact that Defendants at no time warned their customers or the public about the unremedied defect in their refrigerators. It is an admitted, undisputed fact that the defect here is the leaking of highly flammable gas which no recall, including the last one issued in 2010 was able to, designed to, or intended to remedy.

The District Court also erred dismissing Colbert's warranty claims. Defendants did not seek summary judgment on that basis with respect to Colbert and it was error to grant it. The Trial Court erred in holding Colbert was not within the class of commercial transactions contemplated by the statute and ignoring the "affected" by language in the statute. (JA 2066-2067). The District Court further erred in finding the Fireman's Rule applied to the breach of the implied warranty claim, despite no case having ever done so, and without considering all the conduct in the record that amounted to willful and wanton conduct if the Fireman's Rule did apply to such claims. The District Court also argued that Colbert had no claim based on strict liability because Virginia does not recognize such a claim, but neither the

Runnels nor Colbert asserted such a claim in the live pleading. (JA 21-38; 2065-2066).

Finally, the law has changed and the amended statute applies to this case. Defendants' conduct is certainly grossly negligent in its choice of design for the refrigerator and failing to warn about the continuing defective nature of its refrigerators. To the extent that the Fireman's Rule would apply to a warranty claim, if Defendants' conduct is grossly negligent with regard to the negligence claims, it is with regard to the warranty claim because the analysis is the same. There is a genuine issue of material fact as to Defendants' gross negligence or willful and wanton conduct.

Colbert respectfully requests that this Court vacate the grant of summary judgment on all of Colbert's claims and remand Colbert's entire case for a trial setting.

## STANDARD OF REVIEW

### A.  Standard of Review on Appeal of Summary Judgment

The review on appeal is *de novo*. *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435-36 (4th Cir. 2001) (other citation omitted). This Court held:

> In reviewing the evidence in the record, we should draw all reasonable inferences in favor of the non-moving party, here, Edell and his law firm, and we may not make credibility determinations or weigh the evidence. Although we should review the record as a whole, we must

disregard all evidence favorable to the moving party, here, the Angelos Firm, that a jury would not be required to believe. "That is, [we] should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

*Id*. at 435-36 (internal citations omitted) (quoting *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 149-150 (2000)); *See also Alexander v. Stokes*, 2002 U.S. Dist. LEXIS 176, [*5] (N.D. Tex. 2002) (other citation omitted).

Although Rule 56 has been amended, the analysis in *Edell & Associates* remains good law. The revisions were "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts." 2010 Notes of Advisory Committee, ¶1.

Rule 56(a) states in part:

A party may move for summary judgment, **identifying each claim or defense** – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.

(Emphasis added).

The *movant* "has the initial burden of informing the Court of the basis for its motion and producing evidence which tends to show that no genuine issue as to any material fact exists and that it is entitled to judgment as matter of law." *Id*. (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts are those that might affect the outcome of the case. A dispute as to a material fact is 'genuine' if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party." *Schiff v. San Francisco,* 816 F.Supp.2d 798, 809 (N.D. Cal. 2011) (citing *Anderson*, 477 U.S. at 248). "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id*.

Further, "[i]n considering a motion for summary judgment, the court must construe the facts and reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party." *Lockhart v. Coastal Coal Co., LLC*, 2003 WL 22097984, at *1 (W.D. Va. 2003) (other citations omitted). *Lockhart* made clear: "In other words, the nonmoving party is entitled to have 'the credibility of his evidence as forecast assumed.'" *Id*.

With these principles in mind, this Court should review the District Court's errors as set forth herein *de novo* as the it failed to apply the proper standard and review the entire record, draw all reasonable inferences in Colbert's favor, without weighing the evidence, or making credibility determinations for those claims for which Defendants met their initial Rule 56 burden.

**B.** <u>Legal Standard for Summary Judgment of a Products Liability Claim</u>

This is a products liability case with many facts involved, which means this case is not unique in that regard. It is logical, therefore, that courts have held that "**<u>products liability actions are ordinarily not susceptible of summary adjudication.</u>**" *Young v. J.I. Case*, 1994 WL 506403, *1 (E.D. Va. 1991) (citation omitted; emphasis added); *see also, Baughman v. General Motors Corp.*, 627 F.Supp. 871, 878 (D.N.C. 1985).

<u>ARGUMENT</u>

**I.** <u>THE TRIAL COURT ERRED IN NOT FOLLOWING AND PROPERLY APPLYING THE STANDARD OF REVIEW AND IN DISMISSING COLBERT'S NEGLIGENCE CLAIMS</u>

The Trial Court granted summary judgment as to both negligence claims despite Defendants failing to request summary judgment on Colbert's failure to warn claim. The Court also applied the Fireman's Rule to both claims despite not considering all of the evidence pertaining to Defendant's willful and wanton conduct related to its negligent design and in not properly applying the summary judgment standard in so doing. The Court erred in considering and ruling upon the negligence claim based on failure to warn because that was not even requested by Defendants in their opening brief and because it did not consider the evidence of willful and wanton conduct that applied specifically to that claim. The Court seemingly

dismissed the claims as a matter of law without finding that there is no genuine issue of material fact and without considering all of the evidence.

## A.    *The Fireman's Rule*

Since Colbert is a first responder, whether the Fireman's Rule applied to bar his claims has to be considered. Va. Stat. §8.01-226. If it applies, whether an exception to its application must be next considered. The pertinent exception to the Fireman's Rule at the time this case was decided was based on case law was whether the Defendants' conduct was willful and wanton. However, the Fireman's Rule has since been amended to codify four exceptions to its application, gross negligence being applicable. Since this amendment is procedural in nature, it should apply retroactively.

### 1.    The Fireman's Rule *before* Its Amendment

In 1993, the Virginia Supreme Court decided *Goodwin v. Hare*, which involved the Fireman's Rule in the context of an intentional or willful and wanton conduct for the first time.  The Court concluded:

> One policy rationale underlying the fireman's rule is that fire fighters and law enforcement officers are compensated for their injuries and damages incurred in the line of duty by workers' compensation and other benefits. Therefore, the financial losses of the employees and their employers are more appropriately borne by the public rather than by the negligent defendants.
>
> There is no reason here, however, to shift that burden to the public in the case of injuries or damages intentionally inflicted upon these public officials or their employees. Further, there are many reasons to impose

that financial burden upon the intentional actor rather than the public. Indeed, we have indicated that the fireman's rule would not apply if the defendant's conduct was: (1) willful or wanton, or (2) the violation of a statutory duty created for the express benefit of these public officials.

246 Va. 402, 404 (1993). (Internal citations, other citations, footnotes omitted).

The Court concluded that summary judgment based on the Fireman's Rule was inappropriately granted to the defendant in that case. *Id*. at 405. Likewise, the court in *Hudgins v. Holman* held that the Fireman's Rule "does not extend to cases where there is a willful and wanton conduct amounting to gross negligence."[6] 49 Va. Cir. 279, *6 (1999); *see also Goodwin*, 246 Va. at 404. In the circumstance where an officer is injured through an intentional tort, leading to his injury or death, "the Court in *Goodwin* held that the fireman's rule was inapplicable where (1) the defendant's conduct is wilful or wanton..." *Greene v. Consol. Freightways Corp. of Delaware*, 74 F.Supp.2d 616, 622 (E.D. Va. 1999). *Hudgins* held that, "The term willful and wanton imports the knowledge and consciousness that injury will result from the act done, which act must be intended or must involve a reckless disregard for rights of another and will probably result in an injury." 49 Va. Cir. at *7 (other citations omitted). Further, "[t]o be guilty of willful and wanton conduct, the tortfeasor must be conscious of his conduct and conscious from his knowledge of

---

[6] *Hudgins* used "gross negligence" as an exception to the Fireman's Rule; even as most cases require willful and wanton conduct which is usually described as a higher standard than gross negligence. Now, the amendment to the Fireman's Rule expressly uses gross negligence as an exception.

existing conditions that injury would probably result." *Id*. But, "[w]ith reckless indifference to consequence, he consciously and intentionally commits a wrongful act or omits a known duty, which produces an injury." *Id*. That is precisely the situation here.

Applicable to this case, *Hudgins* observed that:

> It should be noted that in certain extreme circumstances, a court could sustain a finding of willful and wanton conduct for failure to implement safety items due to cost where the danger was terribly great and the cost to mitigate was modest and reasonable, or a company weighed the ultimate cost of litigation versus the cost of inattention (*i.e.*, The Ford Pinto Case).

*Id*. at *8.

*Hudgins* found nothing analogous in that case; but here, there is abundant evidence that the danger was terribly great in terms of the particular defect, while the cost to mitigate was modest.[7] Also unlike *Hudgins*, Defendants' conduct is not consistent with the standard business thinking involving the laws of economics that occurs in every day America. *Id*.

In addition, *Greene v. Consolidated Freightways Corp*. left open the door that the Fireman's Rule would not apply in the event of a defect which caused an injury. 74 F. Supp. 2d at 621 (E.D. Va. 1999). *Greene* was a case where a police officer was

---

[7] The Trial Court placed too much emphasis on the Ford Pinto Case and appeared to misunderstand Colbert's mention of this part of *Hudgins*. The point here is that Defendants had a concealed defect that they neither addressed the root cause of nor warned anyone about. While the remedy was cheap, that was not the main point.

injured when he fell from a truck he had climbed up on in order to arrest the driver, and sued the owner of the truck/the driver's employer, Consolidated. *Id*. at 620-621. Among the facts the Court considered was whether there was anything "negligent about the maintenance of the truck itself" and whether "any action associated with Consolidated's activities had anything to do with the forcible removal of Parker [the driver] from the truck…" *Id*. at 621.

In addition, the Court noted that "nothing in the record indicates that the actions of Consolidated caused the fall…nor has Plaintiff alleged that the truck was defective in some regard, causing Greene to fall." *Id*. It is significant that *Greene* considered whether a defect was involved. The Trial Court's Memorandum Opinion criticized this observation and analysis of *Greene* as "the purest of dicta." (JA 2065). With all due respect, Colbert did not rely on this analysis in *Greene* as "[a] statement of opinion or belief held to be authoritative because of the dignity of the person making it" or "[a] familiar rule; a maxim" as that term is defined in BLACK'S LAW DICTIONARY. 189 (Pocket ed. 1996).

Rather, this aspect of the decision in *Greene* was analyzed as it is the *only* case in Virginia considering the Fireman's Rule while considering a potential defect in a product. Thus, it gives some insight into how a court might view the matter. If the presence of a defect were irrelevant to the Fireman's Rule analysis, the Court would not have bothered to consider it. But the Court made the observation about whether

an allegation had been made about a defect in the context of determining whether or not to apply the Fireman's Rule in that case. Finding no such allegation, the Court continued with its analysis and whether the intentional tort exception applied so as to bar the application of the Fireman's Rule and cited *Goodwin's* exceptions to the Fireman's Rule which included "defendant's willful and wanton conduct." *Id*. at 622. But that could not be considered in *Greene* because the pleadings did not support it. *Id*. Further, the Court assumed that the intentional conduct of the driver fell outside his scope of employment so as to prevent a finding of vicarious liability on the part of Consolidated, his employer. *Id*. at 623.

The Court was open to the Fireman's Rule not applying in that case had the pleadings and facts supported it. The pleadings and facts here clearly support a finding that the Fireman's Rule is inapplicable here. All three Defendants testified extensively regarding their knowledge of the ineffectiveness of the 2010 recall before it was even issued. They all testified for how long they have known – well over a decade – and that despite knowing what the root cause of the defect was, they never once issued a recall to deal with it. They all also testified that they did not warn customers of the remaining hazards that could cost people their lives, their limbs, and their property and told them that it was safe. This is a case where the benefit of the Fireman's Rule should not be enjoyed by Defendants.

In *Lockhart v. Coastal Coal Co., LLC*, the Western District of Virginia found that the Fireman's Rule would not be expanded to bar a coal mine inspector's claim for injuries. 2003 WL 22097984 (W.D. Va. 2003). One reason the Court would not apply the Rule is that "the fireman's rule does not contemplate a person in Plaintiff's position." *Id*. at *3. The same might be said here – the Fireman's Rule in Virginia is not a free pass to a third party whose willful and wanton conduct caused an injury. The *Lockhart* Court noted "**recent Virginia precedent limiting the application of this rule**." *Id*. (Emphasis added). Another reason given was, "**the rule should be construed narrowly**, as stated by the Magistrate, **based on a fundamental tenet in our jurisprudence that each person has a right of redress for injuries wrongfully caused by another**." *Id*. at *4. (Other citations omitted; emphasis added).

Under Virginia law, willful and wanton conduct[8] is what must be shown to get the question of punitive damages to a jury, but also what is necessary to meet an exception to the Fireman's Rule. *Fravel v. Ford Motor Co*. held:

> Willful and wanton negligence is acting consciously in disregard of another person's rights or acting with reckless indifference "to [the] consequences with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct **probably** would cause injury to another." *Woods*, 265 Va. at 76–77, 574 S.E.2d at 268 (citations omitted). "Willful or wanton negligence involves a greater

---

[8] *See, e.g., Sawyer v. C.L. Pincus, Jr. & Co., Inc.*, 83 Va. Cir. 251, *2 (2011). (Other citations omitted) (fact-specific inquiry with each defendant's act or omissions individually evaluated).

degree of negligence than gross negligence," in that **an essential ingredient of the act or omission in willful or wanton negligence is an actual or constructive consciousness of the danger involved**.

973 F.Supp.2d 651, 655 (W.D. Va. 2013) citing *Foglia v. Clapper*, 2012 WL 777492, at *4 (E.D. Va. Mar. 7, 2012) (citing *Woods v. Mendez*, 265 Va. 68, 76 (2003)).

The Court concluded:

…Fravel has alleged that Ford had actual knowledge of a design defect; specifically, the propensity of vehicle equipped with the ETS system to experience unintended acceleration. Fravel further alleges that, despite knowledge of this risk of substantial harm, Ford consciously chose to equip and sell the vehicle without any brake override system or warning to the consumer public. If such facts are true, that would be sufficient to find that Ford acted with the requisite reckless indifference or conscious disregard to the injury it was aware would probably result from its conduct.

*Id.* at 656 citing *Boward v. Leftwich*, 197 Va. 227, 231, 89 S.E.2d 32, 35 (1955); *Green v. Ingram*, 269 Va. 281, 292, 608 S.E.2d 917, 923 (2005); *Infant C. v. Boy Scouts of America, Inc.*, 239 Va. 572, 582, 391 S.E.2d 322, 327 (1990)); *See also, Sayegh v. The Raymond Corp.*, 2016 WL 6477008, *3 (W.D. Va. Nov. 1, 2016) (products liability action reiterating the willful and wanton standard set forth in *Infant C*).

Willful and wanton conduct, it would seem, "as with any issue of fact withdrawn from the jury's consideration, [the court] must consider whether the evidence is such that reasonable persons could only drawn one inference therefrom."

*Huffman v. Love*, 245 Va. 311, 314 (1993) (other citations omitted). Stated another way, "[i]f reasonable persons, upon the facts presented, could differ regarding whether [the defendant's] conduct is so willful and wanton as to show a conscious

disregard of the rights of others, a jury question is presented."[9] *Id*. (Other citations omitted). In addition, "[e]ach case raising an issue of willful and wanton negligence must be evaluated on its own facts, and a defendant's entire conduct must be considered in determining whether his actions or omissions present such a question for a jury's determination."[10] *Alfonso v. Robinson*, 257 Va. 540, 545-46 (1999). This is the same as in the context of a summary judgment.

Defendants argued that they exercised "some care" which the Trial Court agreed with, albeit without looking to all of the disputed evidence applicable to each claim. Further, the Trial Court disregarded the Virginia law which has held even where "some care" was taken, the matter of punitive damages still went to a jury. *Crouse v. Medical Facilities*, 86 Va. Cir. 168, at *11 (2013). In this case, given that the standard there was willful and wanton, that applies to the analysis required for the Fireman's Rule.

---

[9] *Huffman*, involved a jury trial where the district court struck plaintiff's claims for punitive damages where she suffered personal injury due to the negligence of an intoxicated driver. While portions of that case seem specific to that context (and later the statute was amended to liberalize punitive damages in the context of intoxicated drivers), other parts of it are applicable to a general discussion of punitive damages. The standard of review is almost identical to that of a summary judgment.

[10] Cited by Defendants, *Alfonso* found that considering a truck driver's negligence and the cumulative evidence of his prior knowledge of the risks that created, which he admitted, raised a question of whether he willful and wanton conduct and the jury was properly instructed on that issue.

Also, the focus must be on what care was given to the actual danger at issue. Again, "[w]illful or wanton negligence involves a greater degree of negligence than gross negligence," in that **an essential ingredient of the act or omission in willful or wanton negligence is an actual or constructive consciousness of the danger involved**." *Fravel*, 973 F.Supp.2d at 655 (emphasis added). "The danger" at issue here is the corrosion and leaking of highly flammable hydrogen gas. None of the recalls addressed this or were even intended to, which is an undisputed fact and admitted by the Defendants themselves in sworn deposition testimony. More to the point, the operative recall here – the last one issued in 2010 which applied to the Runnels' refrigerator although they did not receive a notice until 2012 – happened well after Defendants knew of the nature of the defect (corrosion and leaking flammable gas) but still issued a recall they admit they knew did not address it. The Trial Court erred in disregarding this evidence and what the danger actually is and what conduct Defendants engaged in to mitigate that risk – which was nothing at all.

As will be shown herein, at a minimum there is a genuine issue of material fact as to whether Defendants engaged in, some care or any care at all (depending upon the claim), and willful and wanton conduct which bars the application of the Fireman's Rule.

## 2. The Fireman's Rule *after* Its Amendment; Applies Retroactively

The Fireman's Rule was amended to codify exceptions to it from the common law as well as others. This is important for a number of reasons. First, it should apply retroactively based on statutory language and case law. Second, this amendment undermines the public policy arguments set forth – and relied on very heavily – by the Trial Court in justifying its broad application of the Fireman's Rule to every conceivable claim in the face of evidence that there is at least a genuine issue of material fact as to Defendants' willful and wanton conduct on each claim. Third, this amendment falls in line with the overall trend to back away from such expansive application of the Fireman's Rule which the *Lockhart* court noted years ago. This is evident in the amendment itself, case law cited by Colbert applying Virginia's case law, and the *reversal*[11] of *Krauth v. Geller* which the Trial Court relied upon as one of two cases which it said "prevents plaintiffs [*sic*] from recovering on theories of negligence or strict liability in products liability cases." (JA 2067).

The Fireman's Rule now includes the following exceptions to its application:

The common-law doctrine known as the fireman's rule, a doctrine that limits a defendant's liability for otherwise culpable conduct resulting in property damage and injuries to the public officials named in this section, shall not be a defense to claims (i) against third parties whose

_____

[11] *Ruiz v. Mero*, 189 N.J. 525 (2007) overruled *Krauth v. Geller*, 31 N.J. 270 (1960). The Trial Court relied heavily on the cases cited in *Krauth* for its public policy based decision applying Virginia's Fireman's Rule so broadly. But *Krauth* had been overruled a decade before this opinion was written.

negligent acts did not give rise to the emergency to which such public official is responding and who were not occupiers of the premises where such emergency arose and injuries occurred; (ii) arising out of further acts of negligence separate and apart from the negligent acts that gave rise to the emergency to which such public official is responding; (iii) based upon a violation of a statutory duty created for the express benefit of such public official; or (iv) against parties whose conduct qualifies as an intentional tort, **gross negligence, or willful or wanton misconduct**.

2017 Virginia Laws Ch. 315 (H.B. 1590) (approved March 13, 2017) (emphasis added).[12]

Title 8.01, of which the Fireman's Rule is a part, contains the following provision for retroactive application of amendments:

> Except as may be otherwise provided in § 8.01-256 of Chapter 4 (§ 8.01-228 et seq.) (Limitations of Actions), all provisions of this title shall apply to causes of action which arose prior to the effective date of any such provisions; provided, however, that the applicable law in effect on the day before the effective date of the particular provisions shall apply if in the opinion of the court any particular provision (i) may materially change the substantive rights of a party (as distinguished from the procedural aspects of the remedy) or (ii) may cause the miscarriage of justice.

Va. Stat. § 8.01-1.

Case law has explained how this section is to be construed and applied. To begin, amendments are intended to be applied retroactively unless the two exceptions apply: a material change in a substantive right (as opposed to a procedural aspect of the remedy) or a miscarriage of justice. The only miscarriage of justice

---

[12] Please see a copy of the amended statute and Bill Tracking Information in the Addendum its enactment and effective date of July 1, 2017.

here would be *not* applying the amendment and exceptions to the Fireman's Rule.

The case of *Shiflet v. Eller*, 228 Va. 115 (1984) explained the distinction between substantive and procedural rights in the context of a change in the law as to the right of contribution.

> Preliminarily, we observe that "substantive" rights, as well as "vested" rights, are included within those interests protected from retroactive application of statutes. The concept of protection of substantive rights was incorporated by the General Assembly into Virginia civil procedure with the enactment of Title 8.01, effective October 1, 1977. Specifically, § 8.01–1 provides for retroactive application of all provisions of the Title, unless a particular provision "may materially change the substantive rights of a party (as distinguished from the procedural aspects of the remedy) ...." Substantive rights, which are not necessarily synonymous with vested rights, are included within that part of the law dealing with creation of duties, rights, and obligations, as opposed to procedural or remedial law, which prescribes methods of obtaining redress or enforcement of rights. Black's Law Dictionary 1281 (5th ed. 1979). "While all vested rights may be considered substantive ... it does not necessarily follow that the only subject matter that is considered to be substantive is that which relates to vested rights." *Joseph v. Lowery*, 261 Or. 545, 550, 495 P.2d 273, 276 (1972).

> Next, we must determine the nature of the right of contribution and when it comes into existence, keeping in mind the difference between a cause of action and a right of action. A right of action is a remedial right to presently enforce a cause of action; operative facts giving rise to a right of action comprise a cause of action. *First Virginia Bank-Colonial v. Baker*, 225 Va. 72, 81, 301 S.E.2d 8, 13 (1983). "While a cause of action and a right of action may accrue simultaneously, they do not necessarily do so." *Id.*, 301 S.E.2d at 13.

*Id.* at 120-121.

The codified exceptions applicable to this case were already present in the common law and are not a material change of a substantive right. Rather, what

Colbert has here is a right of action, a remedial right, to presently enforce a cause of action and this prescribes methods by which he may obtain redress or otherwise enforce his rights. The codification clarifies that the Virginia legislature intends that gross negligence also be an exception to the application of the Fireman's Rule, which *Hudgins* held as well.

In *Fletcher v. Tarasidis*, the Supreme Court of Virginia held, "Nor does a litigant, successful in the trial court, acquire a vested right upon entry of the judgment; the right is inchoate and does not become vested until the judgment has been affirmed on appeal or the time allowed for appeal has expired." 219 Va. 658, 661 (1979) (other citations omitted). In *Fletcher*, at the time the judgment was entered, the amendment had not been enacted. *Id.* at 662. The question was whether the appellate court was to apply the amendment. *Id.* The Court held: "…when, as here, vested rights are not divested, an appellate court will apply a statute adopted after the date of a judgment entered by a trial court, even though that statute changes the law in effect on that date and requires reversal of a judgment correct when entered." *Id.* (other citations omitted).

Although Colbert argues that the judgment entered against him by the Trial Court was not correct because it did not follow the proper standard of review, *inter alia,* the statute at the time was construed to allow only exceptions to the Fireman's Rule based on intentional torts or willful and wanton conduct, except for *Hudgins*

which allowed for gross negligence.

Gross negligence has been defined as:

> "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]. It must be such a degree of negligence as would shock fair minded [people] although something less than willful recklessness."

*Green v. Ingram*, 269 Va. 281, 290-91 (2005) (quoting *Ferguson v. Ferguson,* 212 Va. 86, 92 (1971)) (other citation omitted) (approving a jury instruction).[13]

Defendants might argue that *Elliott v. Carter* precludes this issue from going to the jury because they will claim they "exercised some degree of diligence and care." 791 S.E.2d 730, 733 (2016). But the analysis of the fact in *Elliott* must be carefully considered. Of special import is the fact that the Court noted that "there is no allegation that Carter was aware of any hidden danger." *Id*. Further, the Court noted that help was rendered specific to the danger – *i.e.,* the supervisor of the boy who drowned in his care actually tried to swim close enough to him to save him. *Id*. In this case, there was a concealed danger and the efforts made had nothing to do with remedying that danger: the recall for this refrigerator did not even attempt to address the defect/the danger of corrosion and leaking flammable hydrogen gas which was concealed from and unknown to the public, the Runnels, and first responders.

---

[13] *See also, Infant C.*, 239 Va. at 583.

The *Elliott* Court noted: "Ordinarily, the question of whether gross negligence has been established is a matter of fact to be decided by a jury." *Id*. at 732. Only "when persons of reasonable minds could not differ upon the conclusion that such negligence has not been established [is it] the court's duty to so rule." *Id*. (Other citation omitted).

For the additional reason that the statute has changed to clearly allow an exception for gross negligence, which Defendants' conduct rises to, the summary judgment should be reversed in its entirety and, as the Court directed in *Fletcher*, his case remanded and "restored to the docket for a trial on the merits." 219 Va. at 662.

### B.    *Negligence Based on Design Defect*

The District Court only considered a small portion of the evidence set forth to demonstrate Defendants' willful and wanton conduct with regard to the negligent design claim. The court below focused on the number of recalls Defendants issued, the amount of money it spent, and that the 2012 redesign (which was not the model the Runnels had) could still pose risks, so it was not, according to the *Court's* weighing of the evidence, a safer alternative design. (JA 2070-2071). But there was a great deal more evidence than what the Court focused on in its Opinion, which is set forth below in a bullet point list. Moreover, the Court did not make a finding as to whether there were genuine issues of material fact. The Court just decided the

issue, weighing the evidence, failing to apply the proper inferences, and failing to find issues of material fact.

The only element of design defect Defendants challenged was the alleged lack of safer alternative design. *Brosville Community Fire Dept., Inc. v. Navistar, Inc.*, 2014 WL 7180791, at \*6 (W.D. Va. 2014) (citing *Logan v. Montgomery Ward & Co., Inc.*, 216 Va. 425, 428 (1975)). In *Navistar*, the Court held, in the context of a summary judgment, that:

> In regards to Navistar's design, [Plaintiff's expert's] report notes that, '**The *probability* is the fire damage could have been prevented or reduced** had Navistar separated the engine block heater cord-set line voltage wiring from the engine low voltage wiring as required by NFPA 1901 Article 22.10.1.'
>
> …I believe Plaintiff has presented evidence that a reasonable, safer alternative design existed: specifically, a design that abided by NFPA 1901. In his report, [Plaintiff's expert] concluded the fire damage could have been prevented had Navistar separated the engine block heater wires as required by NFPA 1901. **At this stage, when I accept the facts in the light most favorable to the nonmoving party, I believe [Plaintiff's expert's] opinion on this issue is sufficient to survive summary judgment. The issue of whether or not a separation in the wires would have made the vehicle safer is for a jury to determine.**

2014 WL 7180791, at \*7. (Emphasis added; footnotes, references to expert's report omitted).

Consistent with *Navistar*, Plaintiffs have evidence that "[t]he **_probability_ of the fire damage could have been prevented or reduced had [Defendants]" used the safer alternative design recommended by their own engineer (who Defendants have designated as an expert in this case) in 2010 as a "solution" to**

**the leaks, which included, thicker boiler tubes**, among other things. *Id*. (Emphasis added). Defendants admitted that after the HTS was installed, there were reports of hundreds of fires; but Defendants also provided evidence showing that after the 2012 redesign, which included the above changes plus the HTS, there are NO REPORTS OF FIRES. Clearly, it is not the HTS that is preventing fires, but the redesign.

In addition, Keifer said that if Defendants had followed the UDRI recommendation in 2005, "they probably would have been successful in solving the root cause" which means that this fire would not have occurred. (JA 1317:13-1318:1). The numerous safer alternative designs proposed by both Colbert's expert *and* Defendants' are as follows:

- increase the thickness of the boiler tubes (utilized at least as far back as 2005 by Jerry Collins; recommended by Bob Cutright as a "solution" to the corrosion in his Powerpoint, given to all three Defendants on July 21, 2010; part of Defendants' redesign in 2012 where they increased the thickness of the boiler wall and the outside diameter of the boiler tubing; materials and designs for which have been in the marketplace since at least 2000) (JA 1553);
- use Helium gas, which is inert, instead of the highly flammable Hydrogen gas which Defendants use (which has also been utilized and which would increase safety even if corrosion could not be stopped) (JA 1303:12-1304:7, 15-16; 1309:3-21; 1310:4-13);
- use a different metal steel or another metal that better resists corrosion (which was recommended to Defendants in the UDRI study of 2005; Keifer talked about material changes as well and that the UDRI recommendation was a safer alternative design) (JA 1315:11-1316:1; 1322:13-20; 1323:3-6);
- space the heater pocket welds further apart (recommended by Bob Cutright as a "solution" to the corrosion in his Powerpoint to all three Defendants on July 21, 2010; part of the redesign in 2012, but

the heat pocket welds were also adjusted as part of a design modification in 2001; materials and designs for which have been in the marketplace since at least 2000) (JA 1553);

- add metal heat shielding around the insulation of the boiler tube wall (part of the redesign in 2012; utilized by Norcold's competitor, Dometic; materials and designs for which have been in the marketplace since at least 2000);

- change design to increase weak solution concentration to lower the operating temperature of the refrigerator (recommended by Bob Cutright as a "solution" to the corrosion in his PowerPoint) (JA 1553);

- lower the temperature of the boiler tube to reduce the consumption of the sodium chromate corrosion inhibitor (an effect of the 2012 redesign);

- Keifer also recommended creating a high-temperature corrosion layer (utilizes the same materials; (JA 1304:18-1306:22); and

- Keifer recommended changing the location of the welds to address the heat flux (which has been done before; (JA 1307:19-1308:17; 1314:2-19).

Defendants knew that thicker boiler tubes were a solution in at least 2005 because Jerry Collins was using them and George Strasburg met with him. (JA 1549; 1413:13-19). Keifer's report says that this safer alternative design was actually feasible as far back as 2000. (JA 1547). Keifer also testified that the 2012 redesign may have also solved the problem. (JA 1319:16-1320:5). Defendants argued that Keifer's opinion that the safer alternative design he recommends has no evidentiary support that it was feasible at the time of the manufacture of Plaintiffs' unit. However, in the 2004 *Tunnell* decision the Court specifically relied upon plaintiffs' expert's opinion that his safer alternative design was feasible in 1999. *Tunnell v. Ford Motor Co.*, 2004 WL 1798364, at *4, n.3 (W.D. Va. 2004).

Summary judgment was denied on a design defect claim against Ford where even Ford's expert agreed that the proposed safer alternative design was "**at least…a possibility that…may have assisted or may have helped in this case**." *Tunnell*, 2004 WL 1798364, at*9 (emphasis added). The Court held that the jury could make that determination. Keifer testified similarly. Like the expert in Ford, even Norcold testified that its redesign made the refrigerator safer.[14] If the refrigerator had been made safer in 2005, the fire the Runnels and Colbert endured would not have occurred.

Just as in *Navistar*, Colbert provided sufficient evidence that had Defendants followed their own expert's advice and utilized his "solution" of thicker boiler tubes – among other design alternatives presented by both Defendants' and Plaintiffs' experts – the refrigerator could have been made safer and the fire could have been prevented.[15] (JA 1551-1553). Colbert provided vastly more evidence of a safer alternative design and feasibility than the plaintiff did in *Navistar*.

---

[14]Defendants' entire MSJ argued to the contrary and basically proved up the unreasonably dangerous nature of their product as they claim no one can fix it and even argued – despite testifying otherwise in this case – that their redesign was not about safety and did not make the product safer. (JA 1370:15-1371:3; 1372:16-22).
[15] The Trial Court found that no manufacturer of gas absorption refrigerators had solved the problem of leaking hydrogen gas. (JA 2070). But that is not the standard in Virginia. *Tunnell v. Ford Motor Co.* noted that "…the simple fact that the industry has not chosen to adopt a known safety device does not exonerate Ford." 2004 WL 1798364, at *5 (W.D. Va. 2004) *citing Turner v. Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 251 (1975) ("[E]vidence of industry custom does not establish conclusively that due care was exercised.") (Other citations omitted). The Court

In *General Motors v. Lupica,* the Virginia Supreme Court held that, "[w]hen a defendant has notice and actual knowledge of a defect, it owes a duty to a plaintiff 'to take the steps reasonably necessary to remedy the defect.'" 237 Va. 516, 517, n.1 (1989). Defendants admit that the defect here is the corrosion and leaking of highly flammable gas which they admit was not addressed by any recall, including the operative recall here, the last one which began in 2010. Defendants acted willfully and wantonly because they made no effort – exhibited no care – in addressing the underlying defect, "the danger," in the remedy they offered in the 2010 recall. *Fravel*, 973 F.Supp.2d at 655.

If the amended version of the Fireman's Rule applies, Defendants' conduct certainly rises to the level of gross negligence. Failing to address the root cause of the defect shows indifference to others, an utter disregard of prudence amounting to a complete neglect of the safety of those affected by their product, such that it would shock reasonable people, such as a jury.

---

noted that the defect at issue had been well-known in the industry for three decades, that Plaintiff's expert had created an exemplar safer alternative design using *components* that existed in 1999, and that the balance of risks/dangers versus feasibility and practicability of that design were for the jury. *Id*. (Other citation omitted).

**C.**    *Negligence Based on Failure to Warn*

The Trial Court erred in summarily dismissing Colbert's failure to warn claim by applying the Fireman's Rule to it without any analysis of the record at all and where summary judgment was not requested.

### 1.    Colbert Pleaded a Claim for Failure to Warn

In paragraphs 42, 45-47 of the live pleading, Colbert stated a claim for failure to warn and otherwise pled facts supportive of such a claim. (JA 34-36). Colbert met his burden of pleading the claim, particularly under the recent U.S. Supreme Court case of *Johnson v. City of Shelby, Miss.*:

> Our decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), are not in point, for they concern the factual allegations a complaint must contain to survive a motion to dismiss. A plaintiff, they instruct, must plead facts sufficient to show that her claim has substantive plausibility. Petitioners' complaint was not deficient in that regard. **Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city. Having informed the city of the factual basis for their complaint, they were required to do no more** to stave off threshold dismissal for want of an adequate statement of their claim. *See* Fed. Rules Civ. Proc. 8(a) (2) and (3), (d)(1), (e). For clarification and to ward off further insistence on a punctiliously stated "theory of the pleadings," petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to § 1983. See 5 Wright & Miller, supra, § 1219, at 277–278 ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." (footnotes omitted)); Fed. Rules Civ. Proc. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so

requires.").[16]

135 S.Ct. 346, 347 (2014) (emphasis added).

Under this guidance, a plaintiff is not even required to state his legal theory so long as the facts support the claim. Here the facts – as well as the evidence – support a claim for failure to warn which was sufficiently pleaded.

Finally, it should be noted that warnings were among the myriad affirmative defenses asserted by Defendants. The issue of whether consumers and the public were warned about the dangerous defect of Defendants' product was always at issue and one of the main focuses of discovery in this case, including questioning of the Defendants through their corporate representatives' depositions as demonstrated through the extensive citation to those depositions herein. Defendants at all time had fair notice of this claim, asserted it as a defense, and the case was conducted accordingly by all parties.

### 2. Defendants Did Not Seek Summary Judgment on Colbert's Failure to Warn Claim

That Defendants did not seek summary judgment on Colbert's failure to warn claim is apparent from merely looking at their briefs. Under Virginia law, to prove a negligence claim based on failure to warn, a plaintiff must show: "'A product is

---

[16] Importantly, while in the context of a §1983 claim, the Court's decision is not limited only to those claims. *See e.g.*, *Sheppard v. Monsanto Co.*, 2016 WL 3629074, at * 3 (D. Hawaii 2016) (*Johnson* cited for this proposition in a case based on the Federal Insecticide, Fungicide, and Rodenticide Act).

unreasonably dangerous if it is defective in assembly or manufacture, unreasonably dangerous in design, ***or unaccompanied by adequate warnings concerning its hazardous properties***.'" *Brosville Community Fire Dept., Inc. v. Navistar, Inc.*, 2014 WL 7180791, at *6 (W.D. Va. 2014) (quoting Va. Model Jury Instructions (Civil) § 34.076 (2014) (emphasis added by court)).

These are not the same as the elements for negligence based on a design defect as set forth above. Defendants did not specify what element or elements they claim there is no evidence to support for in failure to warn. Looking to Defendants' opening brief on the substantive claims, summary judgment on the the the negligence cause of action is limited entirely to negligent design. (JA 146-150). Defendants did not meet their initial burden as summary judgment movant, the burden never shifted to Colbert, and it was error for summary judgment to be granted on this claim. *BNLFood Investments Limited SARL v. DSM Nutritional Products, LLC*, 2014 WL 1003844, at *4 (D. Md. 2014).[17]

---

[17] The *BNLFood* Court cites a number of cases from courts within this Circuit and the U.S. Supreme Court to support its holding:

> Under Federal Rule of Civil Procedure 56, the moving party has the burden of establishing that no genuine issues of material fact exist with respect to each claim for which the movant seeks summary judgment... By failing to address BNLfood's section 16 claim in its motion for summary judgment, Martek did not meet its burden of showing that it was entitled to summary judgment on that claim. *See Bradford v. HSBC Mortgage Corp.*, 799 F.Supp.2d 625, 634–35 & n. 20 (E.D. Va. 2011) (denying summary judgment on claim that was not "squarely

The *BNLFood* case has a some similar facts that should guide this court. There the movant, Martek, sought summary judgment on all claims, arguing that the non-movant lacked standing. *Id*. at *3. The Court noted that, "Martek argued that BNLFood lacked antitrust standing generally – it did not distinguish between standing for damage claims and standing for injunctions or mention BNLFood's section 16 claim." *Id*. This is similar to Defendants here claiming they argued negligence in general, when their briefing only addressed design defect, and when the negligence claim**s** of design defect and failure to warn have different elements and are separate claims. Like Defendants here, Martek argued that by requesting summary judgment on all counts, it necessarily included that claim. *Id*. The Court noted the different requirements for each count and that it had never ruled on the injunction claim, and the summary judgment order was silent as to the injunction portion of the claim. *Id*. at *4. The Court vacated its summary judgment on the

_____

address[ed]" in summary judgment memoranda); *Jones v. New York City Health & Hosp. Corp.*, 00 CIV. 7002 (CBM), 2003 WL 21262087, at *1 (S.D.N.Y. May 29, 2003) (although defendants moved for summary judgment on all claims, they did not address one claim in their motion and so "did not meet their burden [on summary judgment] with respect to [that] claim"); *Brown v. Mitchell*, 327 F.Supp.2d 615, 638–39 (E.D. Va. 2004) ("[It] is not the responsibility of the Court to ferret out, from a brief, the legal contentions of the moving party and then to find legal and evidentiary support for them. Likewise, it is not the responsibility of the nonmoving party to engage in a similar exercise in rebutting a motion for summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

section 16 injunction claims.[18] *Id*.

Here, Defendants, like Martek in *BNLFood*, failed to brief failure to warn and did not meet its burden. *See Brown v. Mitchell*, *supra*, 327 F.Supp.2d at 638 ("…the moving party must first demonstrate an absence of proof on that claim…it is settled beyond peradventure that the moving party must demonstrate, by citing legal authority, that the law supports its request for summary judgment") (other citation omitted). The Trial Court erred in granting summary judgment on Colbert's failure to warn claim.

---

[18] Again, the *BNLFood* Court cited a number of cases for support, including from this Court:

> Accordingly, the claim has not been adjudicated, and BNLfood has shown a clear error of law in the Court's opinion and order. *See Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, 93–CV–5148, 2007 WL 4526618, at *2, *15 (E.D.N.Y. Dec. 20, 2007) (granting rule 59(e) motion vacating summary judgment on equitable relief claims under section 16 when defendants did not move for summary judgment on those claims and court erroneously stated in order that the plaintiffs only sought damages); *see also C.H. ex rel. Hardwick v. Heyward*, 404 F. App'x 765, 767–68 (4th Cir. 2010) (dismissing appeal for lack of jurisdiction because-although district court labeled summary judgment order as a "final" judgment-it did not address or adjudicate one of the plaintiff's claims and thus only granted partial summary judgment). Martek's Rule 59(e) motion will be granted insofar as it requests that the Court vacate summary judgment on its section 16 injunction claim.

### 3. Even if Defendants Sought Summary Judgment on Colbert's Failure to Warn Claim, the Trial Court Erred in Applying the Fireman's Rule: There Was Willful and Wanton Conduct

Assuming, *arguendo*, that Defendants did properly plead and meet their initial burden under the summary judgment procedure to set forth those elements they contend have no genuine issue of material fact to support them, Colbert put forth a plethora of evidence not only raising a genuine issue of material fact, but demonstrating as a matter of law that Defendants made no effort whatsoever to warn anyone that their refrigerators retained the defect – leaking highly flammable hydrogen gas – especially after the recall work in 2010 was performed.

Defendants have not specified what element or elements they claim there is no evidence to support. But even if they had, the evidence supports each and every element. The best evidence of this comes straight from the horses' mouths: the Defendants' themselves. As set forth above, Defendants admitted that *the* defect here is leaking highly flammable hydrogen gas. Defendants admitted that the recall work in 2010 did not address this defect. Defendants admitted that *the* defect – leaking highly flammable hydrogen gas – remained. Defendants admitted that they did nothing to warn consumers or the public that even after the HTS was installed pursuant to the 2010 recall, that their refrigerators could continue to leak highly flammable hydrogen gas and that the HTS did not address the defect. Defendants admitted that they continued receiving reports of fires after the HTS was installed.

Defendants admitted that fire occurred in refrigerators after the HTS was installed even where they found that the installation had been properly performed and there had been no attempt to bypass it by anyone. Defendants admitted that this is a dangerous condition that can cause loss of property and life. The evidence also establishes that the presence of leaking hydrogen gas in Norcold refrigerators was not a well-known fact as even the purported expert retained by Defendants was surprised to learn (during his deposition, no less) that hydrogen was an ingredient in the refrigerator. Yet, Defendants never once warned anyone about this concealed danger. Had Mr. Runnels known of this danger – as a retired firefighter himself – he would never have had this product in his RV.

All of this evidence is different than that pertinent to the negligence claim based on a design defect, which is only logical. The claims are not the same, the elements are not the same, nor will the acts and/or omissions be the same that would constitute willful and wanton conduct.[19] Counsel admitted during the summary judgment hearing that "[i]f they can convince you that the defect is just leaking gas,

_____

[19] *See, e.g., Rogers v. Dow Agrosciences, LLC*, 2006 WL 3147393, at * 11 (W.D. Va. 2006) (in the context of a Motion to Dismiss, the "Defendant…argued that if all the other claims against it were dismissed, then the punitive damages claim would have to be dismissed" but the Court ruled "[a]s I have not dismissed the negligence claim…Plaintiffs still have an opportunity to make a case for punitive damages."); *See also, Advanced Marine Enterprises, Inc. v. PRC, Inc.*, 256 Va. 106, 124 (1998) (noting that punitive damages were awarded under certain of the claims brought which involved different legal duties and injuries).

then maybe they can show we didn't do anything, we didn't show the slightest bit of care." (JA 2014:6-9). But Colbert does not have to convince anyone. Again, Defendants themselves know and testified under oath that that is *the* defect. Defendants themselves know and have testified under oath that they warned no one and did nothing. They demonstrated no care. In their counsel's words, they "didn't do anything, we didn't show the slightest bit of care." (*Id.*)

The irony is that the Trial Court went on at some length in its Memorandum Opinion about how there is allegedly no safer alternative design for this refrigerator that will allegedly always leak. (JA 2070-2071). While the Trial Court, in essence, "proves up" the need for a warning, it refused to consider the evidence supporting Defendants' willful and wanton conduct in failing to warn about the remaining risk of harm which supports Colbert being able to proceed on this claim.

### 4. Gross Negligence Exception to the Fireman's Rule Met

There was gross negligence here with regard to Defendants' failure to warn as they exhibited no care at all based on the facts set forth in the section above. Colbert incorporates that evidence and argumentation by reference as if set forth herein. The Trial Court ignored this undisputed evidence of failure to warn, which in these circumstances showed an indifference to others, as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of those affected by the product which would be shocking to reasonable people.

## II. THE TRIAL COURT ERRED IN NOT FOLLOWING AND PROPERLY APPLYING THE STANDARD OF REVIEW AND IN DISMISSING COLBERT'S BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY CLAIM

### A. *Defendants Did Not Seek Summary Judgment on Colbert's Breach of Warranty Claim*

Looking first to Defendants' opening summary judgment brief, there is no request that *Colbert's* warranty claim be dismissed, as the focus was only on the alleged disclaimer. (JA 140-141). Colbert incorporates by reference the arguments set forth about a court being in error in granting summary judgment on a claim for which the movant did not meet its initial Rule 56 burden. Further, although Defendants belatedly claimed they meant to include Colbert's warranty claim, it did not do so until their Response brief to Plaintiffs' Motion for Summary Judgment on Defendants' Affirmative Defenses. (JA 1617-1619). This is insufficient. Finally, Defendants' summary judgment argument about warranty was limited to its argument that it disclaimed the warranty. The Trial Court made no ruling on the issue of disclaimer.

### B. *Colbert Was "Affected by" the Product*

Virginia Statute § 8.2-318 states: "Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer…to recover damages …although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer might reasonably have expected to use, consumer, or be affected by the goods…." Comment 1 states,

in pertinent part: "To the extent that the **contract of sale** contains provisions under which warranties are excluded or modified, or remedies for breach are limited, such provisions are equally operative against beneficiaries of warranties under this section." (Emphasis added.) Comment 2 states, in pertinent part: "The purpose of this section is to give certain beneficiaries the benefit of the same warranty which the buyer received in the **contract of sale**, thereby freeing any such beneficiaries from any technical rules of 'privity.'" (Emphasis added). What this section addresses are parties other than purchasers, like Colbert. But for there to a be a disclaimer of the warranties arising from that sale, there must have been a contract of sale of the product involved with the proper language included.[20]

But a disclaimer can be declared invalid. The Fourth Circuit has long held that, "When a manufacturer is aware that its product is inherently defective, but the buyer has 'no notice of [or] ability to detect' the problem, there is perforce a substantial disparity in the parties' relative bargaining power." *Carlson v. General Motors Corp.*, 883 F.2d 287, 298 (4th Cir. 1989), *cert denied, General Motors Corp.*

_____

[20] The Trial Court cited *Buettner v. R.W. Martin & Sons, Inc.*, 47 F.3d 116, 118 (4th Cir. 1995) and *Sutherlin v. Lowe's Home Centers, LLC*, 2014 WL 4748530, at *3 (E.D. Va. 2014) for the proposition that a nonpurchasing user cannot obtain an independent warranty but just has those warranties preserved for him that was enjoyed by the immediate purchaser, which Colbert does not seek to do. These cases are not contrary to or inconsistent with the arguments made by Colbert, even if they are distinguishable. The product in *Buettner* was sold "as is" which disclaimed all warranties. That is not applicable here. *Sutherlin* also ignored the "affected by" language in the statute.

*v. Carlson*, 110 S.Ct. 1936 (1990) (other citation omitted). *Young* applied that reasoning to a personal injury case, holding: "if it can be established that defendant Case had notice of the alleged defect and that [Plaintiff] did not have similar notice, the purported warranty disclaimer is unconscionable and ineffective." *Young,* 1994 WL 506403, at *4. The Court then found that the "much stronger argument for finding the warranty disclaimer ineffective against plaintiff" was that the "well-recognized doctrine of unconscionability is intended to remove the taint of 'overreaching' from transactions between parties in unequal bargaining positions." *Id*. (citing *Carlson*, 883 F.2d at 292). The most important factor was the "relative disparity in the parties' *bargaining* power." *Id*. (Emphasis by court).

Colbert's claims are not extinguished by this section. As a first responder responding to a fire, a known risk by Defendants of a Norcold refrigerator, he is very much "a person whom the manufacturer might reasonably have expected to use, consumer, **or be affected** by the goods." (Emphasis added). Sec. 8.2-719(3) states: "Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable…" *See also Matthews v. Ford Motor Co*., 479 F.2d 399, 402 (4th Cir. 1973). "Consequential damages" are defined in §8.2-715(2)(b) as: "injury to a person or property resulting from any breach of warranty." Defendants had the burden to present evidence overcoming that presumption of unconscionability which they did not meet. Finally, it should be

noted that breach of the warranty of merchantability can take the form of a failure to warn claim, which Defendants never sought summary judgment on as discussed *supra*. Colbert incorporates those arguments by reference herein.

The Trial Court quoted §8.2-318, but then ignored the "affected by" language and ruled that "Colbert did not interact with the refrigerator as a consumer" and "[t]hese facts place his claims firmly outside the class of commercial transactions contemplated…" (JA 2066-2067). The cases cited by the Trial Court did not hold as such. Both cases simply held that nonpurchasing users did not gain an independent warranty of merchantability, but simply get only what the immediate purchaser received. Colbert never claimed a warranty greater than what the Runnels' had – or even Winnebago. Notably, the Trial Court did not rule that the warranty had been properly disclaimed. Neither case cited by the Trial Court supports its refusal to consider the statutory language and facts that Colbert was "affected by" the defective refrigerator.

## C.   *If the Fireman's Rule Applies, the Willful & Wanton Exception Also Applies*

No case has applied the Fireman's Rule to warranty claims. But even if this Court decides to broaden the application of the Fireman's Rule to such cases, for the same reasons as set forth above in the discussion as to negligent design, the willful and wanton exception applies here allowing Colbert to proceed with his claim. *See, e.g.*, *Holiday Motor Corp. v. Walters*, 292 Va. 461, 477-78 (2016) ("the standard of

safety of goods imposed on…the manufacturer of a product is essentially the same whether the theory of liability is labeled warranty or negligence. The product must be fit for the ordinary purposes for which it is to be used.") (other citation omitted).

### D. The Fireman's Rule Was Amended, There Was Gross Negligence

If the Fireman's Rule applies to a warranty claim and the amended version of the statute is used, there is a fact issue as to gross negligence based on the analysis set forth above under design defect.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Order granting summary judgment in Defendants' favor and vacate and remand this case for trial.

Respectfully submitted,

**For the Appellant:**

/s/ Kassi Dee Patrick Marks

BRADLEY L. LEGER
KASSI DEE PATRICK MARKS
**LEGER KETCHUM & COHOON, PLLC**
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
Tel: 832.764.7200
Fax: 832.764.7211
bleger@lkclawfirm.com
kmarks@lkclawfirm.com

## **STATEMENT REGARDING ORAL ARGUMENT**

Due to the significant issues of first impression raised by this appeal and that this decision will potentially affect the right of all first responders in Virginia to be able to seek redress for personal injuries, Appellant Brian Colbert respectfully requests that this Court grant oral argument in this case pursuant to Federal Rule of Appellate Procedure 34 and Local Rule 34.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. 17-1419    **Caption:** Brian Colbert, Plaintiff-Appellant, v. Norcold, Inc., et al

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains _____12,968_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word for Mac Version 15.14 [*identify word processing program*] in
14 point Times Font _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Kassi Dee Patrick Marks _____

Party Name Brian Colbert, Plaintiff-Appellant _____

Dated: June 30, 2017 _____

[ Print ]   [ Save ]   [ Reset Form ]   11/14/2016  SCC

## CERTIFICATE OF SERVICE

I certify that on June 30, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the address listed below:

Martin A. Conn
Lisa M. McMurdo
Laura May Hooe
MORAN REEVES & CONN PC
100 Shockhoe Slip, 4th Floor
Richmond, Virginia 23219

*Counsel for Appellees*

/s/ *Kassi Dee Patrick Marks*
Kassi Dee Patrick Marks

# ADDENDUM

2017 Virginia Laws Ch. 315 (H.B. 1590)

VIRGINIA 2017 SESSION LAW SERVICE

REGULAR SESSION

Additions are indicated by **Text**; deletions by
~~Text~~ .
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~Text~~ .

Ch. 315
H.B. No. 1590
EMERGENCIES—ENTRY ON PROPERTY—NEGLIGENCE

An Act to amend and reenact § 8.01–226 of the Code of Virginia, relating to
duty of care to law-enforcement officers and firefighters; the fireman's rule.

Approved March 13, 2017

Be It Enacted by the General Assembly of Virginia:

1. That § 8.01–226 of the Code of Virginia is amended and reenacted as follows:

<< VA ST § 8.01–226 >>

### § 8.01–226. Duty of care to law-enforcement officers, firefighters, etc.

**A.** An owner or occupant of real property containing premises normally open to the public shall, with respect to such premises, owe to firefighters, Department of Emergency Management hazardous materials officers, nonfirefighter regional hazardous materials emergency response team members, and law-enforcement officers who in the performance of their duties come upon that portion of the premises normally open to the public the duty to maintain the same in a reasonably safe condition or to warn of dangers thereon of which he knows or has reason to know, whether or not such premises are at the time open to the public.

An owner or occupant of real property containing premises not normally open to the public shall, with respect to such premises, owe the same duty to firefighters, Department of Emergency Management hazardous materials officers, nonfirefighter regional hazardous materials emergency response team members, and law-enforcement officers who he knows or has reason to know are upon, about to come upon**,** or imminently likely to come upon that portion of the premises not normally open to the public.

While otherwise engaged in the performance of his duties, a law-enforcement officer, Department of Emergency Management hazardous materials officer, nonfirefighter regional hazardous materials emergency response team member, or firefighter shall be owed a duty of ordinary care.

**The common-law doctrine known as the fireman's rule, a doctrine that limits a defendant's liability for otherwise culpable conduct resulting in property damage and injuries to the public officials named in this section, shall not be a defense to claims (i) against third parties whose negligent acts did not give rise to the emergency to which such public official is responding and who were not occupiers of the premises where such emergency arose and injuries occurred; (ii) arising out of further acts of negligence separate and apart from the negligent acts that gave rise to the emergency to which such public official**

is responding; (iii) based upon a violation of a statutory duty created for the express benefit of such public official; or (iv) against parties whose conduct qualifies as an intentional tort, gross negligence, or willful or wanton misconduct.

**B.** For purposes of this section, ~~the term~~ "law-enforcement officers" ~~shall mean~~ **means** only police officers, sheriffs**,** and deputy sheriffs and ~~the term "firefighter"~~ **"firefighters"** includes (i) emergency medical personnel and (ii) special forest wardens designated pursuant to § 10.1–1135.

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## 2017 SESSION

### HB 1590 Duty of care to law-enforcement officers and firefighters; fireman's rule.

Introduced by: Jeffrey L. Campbell | all patrons    ...    notes | add to my profiles

### SUMMARY AS PASSED: (all summaries)

**Duty of care to law-enforcement officers and firefighters; fireman's rule.** Provides that the common-law doctrine known as the fireman's rule, as described in the bill, shall not be a defense to certain claims. The fireman's rule is based on assumption of the usual risks of injury in such employment, whether caused by a negligent or a nonnegligent act of the defendant.

### FULL TEXT

**01/02/17  House: Prefiled and ordered printed; offered 01/11/17 17102558D**  pdf

**02/15/17  Senate: Committee substitute printed 17105562D-S1**  pdf

**02/24/17  House: Bill text as passed House and Senate (HB1590ER)**  pdf

**03/13/17  Governor: Acts of Assembly Chapter text (CHAP0315)**  pdf

### HISTORY

01/02/17  House: Prefiled and ordered printed; offered 01/11/17 17102558D

**01/02/17  House: Referred to Committee for Courts of Justice**

**01/13/17  House: Assigned Courts sub: Civil Law**

**01/23/17  House: Subcommittee recommends reporting (7-Y 0-N)**

**01/27/17  House: Reported from Courts of Justice (21-Y 0-N)**

01/31/17  House: Read first time

02/01/17  House: Read second time and engrossed

02/02/17  House: Read third time and passed House BLOCK VOTE (95-Y 0-N)

**02/02/17  House: VOTE: BLOCK VOTE PASSAGE (95-Y 0-N)**

02/03/17  Senate: Constitutional reading dispensed

**02/03/17  Senate: Referred to Committee for Courts of Justice**

**02/15/17  Senate: Reported from Courts of Justice with substitute (15-Y 0-N)**

02/15/17  Senate: Committee substitute printed 17105562D-S1

**02/17/17  Senate: Constitutional reading dispensed (39-Y 0-N)**

02/20/17  Senate: Read third time

02/20/17  Senate: Reading of substitute waived

02/20/17  Senate: Committee substitute agreed to 17105562D-S1

02/20/17  Senate: Engrossed by Senate - committee substitute HB1590S1

**02/20/17  Senate: Passed Senate with substitute (39-Y 0-N)**

**02/20/17  Senate: Reconsideration of Senate passage agreed to by Senate (40-Y 0-N)**

**02/20/17  Senate: Passed Senate with substitute (40-Y 0-N)**

02/21/17  House: Placed on Calendar

02/21/17  House: Senate substitute agreed to by House 17105562D-S1 (97-Y 0-N)

**02/21/17  House: VOTE: ADOPTION (97-Y 0-N)**

02/24/17  House: Enrolled

02/24/17  House: Bill text as passed House and Senate (HB1590ER)

02/24/17  House: Signed by Speaker

02/24/17  Senate: Signed by President

02/28/17  House: Enrolled Bill communicated to Governor on 2/28/17

02/28/17  Governor: Governor's Action Deadline Midnight, March 27, 2017

03/13/17  Governor: Approved by Governor-Chapter 315 (effective 7/1/17)

03/13/17  Governor: Acts of Assembly Chapter text (CHAP0315)