In The
# United States Court of Appeals
### For The Fourth Circuit

## BRIAN COLBERT,

*Plaintiff – Appellant,*

**and**

## MICHAEL RUNNELS; DONNA RUNNELS,

*Plaintiffs,*

**v.**

## NORCOLD, INC.; THETFORD CORPORATION; THE DYSON-KISSNER-MORAN CORPORATION,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT

---

Bradley L. Leger
Kassi Dee Patrick Marks
LEGER KETCHUM & COHOON, PLLC
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
(832) 764-7200

*Counsel for Appellant*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ ii

SUMMARY OF THE ARGUMENT ............................................................. 1

ARGUMENT ................................................................................................. 3

    I.     Fact Issues Created, Left Undisputed by Defendants ............... 3

    II.    Defendants' Response Establishes that They Did NOT
           Move for Summary Judgment on Colbert's Failure
           to Warn & Negligent Design Claims ..................................... 10

    III.   The Fireman's Rule in Products Liability Cases .................... 13

    IV.   Defendants' Willful & Wanton (and Grossly
           Negligent) Conduct ................................................................ 17

    V.     The Fireman's Rule as Amended ........................................... 22

    VI.   Colbert's Warranty Claim ...................................................... 23

CONCLUSION ............................................................................................ 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. Mailand,*
    284 N.W.2d 343 (Minn. 1979) .......................................................... 16

*Baughman v. General Motors Corp.,*
    627 F.Supp. 871 (D.N.C. 1985).......................................................... 2

*BNLFood Investments Limited SARL v.*
*DSM Nutritional Products, LLC,*
    2014 WL 1003844 (D. Md. 2014)...................................................... 11

*Brosville Community Fire Dept., Inc. v. Navistar, Inc.,*
    2014 WL 7180791 (W.D. Va. 2014).............................................. 9-10

*Brown v. GE,*
    648 F.Supp. 470 (M.D. Ga. 1986) .................................................... 14

*Burke v. Deere & Co.,*
    6 F.3d 497 (8th Cir. 1993) ............................................................20-21

*Chesapeake & Ohio Ry. Co. v. Crouch,*
    208 Va. 602 (1968) ........................................................................... 14

*Commonwealth v. Millsaps,*
    232 Va. 502 (1987)........................................................................... 14

*Edell & Associates, P.C. v. Law Offices of Peter G. Angelos,*
    264 F.3d 424 (4th Cir. 2001) ..........................................................1-2

*Elliott v. Carter,*
    791 S.E.2d 730 (2016)...................................................................... 23

*Ford Motor Co. v. Bartholomew,*
    224 Va. 421 (1982) .......................................................................... 19

*General Motors v. Lupica,*
    237 Va. 516 (1989) ............................................................. 18

*Goodwin v. Hare,*
    246 Va. 402 (1993) ............................................................. 15

*Greene v. Consol. Freightways Corp. of Delaware*,
    74 F.Supp.2d 616 (E.D. Va. 1999) .............................................15-16

*Hudgins v. Holman,*
    49 Va. Cir. 279 (1999) ........................................................ 20

*Lockhart v. Coastal Coal Co., LLC,*
    2003 WL 22097984 (W.D. Va. 2003) ............................................. 15

*Lockhart v. Coastal Coal Co., LLC,*
    2003 WL 22076561 (W.D. Va. 2003) ............................................. 15

*Mahoney v. Carus Chem. Co.,*
    510 A.2d 4 (1986) ............................................................. 16

*Murray v. Correct Care Solutions, LLC,*
    2017 WL 214189 (E.D. Va. 2017) .............................................. 23

*Mosely v. Wyeth, Inc.*,
    719 F.Supp.2d 1340 (S.D. Ala. 2010) ......................................... 25

*Nacci v. Volkswagen of America, Inc.*,
    325 A.2d 617 (Del. Sup. Ct. 1974) ........................................... 24

*Philip Morris, Inc. v. Emerson,*
    235 Va. 380 (1988) ..........................................................18-19

*Pottebaum v. Hinds*,
    347 N.W.2d 624 (Iowa 1984) .................................................. 14

*Ruiz v. Mero,*
    189 N.J. 525 (2007) ......................................................... 16

*Sawyer v. C.L. Pincus, Jr. & Co., Inc.*,
    83 Va. Cir. 251 (2011)...................................................................... 2

*Young v. J.I. Case*,
    1994 WL 506403 (E.D. Va. 1991) ...................................................... 2

*Wasik v. Borg,*
    423 F.2d 44 (2d Cir. 1970) ............................................................... 25

*White v. Edmond,*
    971 F.2d 681 (11th Cir. 1992) .................................................... 14, 16

## **Rules**

Fed. R. Civ. P. 56(a).......................................................................... 1

## **Statutes**

Minn. Stat. Ann. §604.06................................................................ 16

Va. Stat. § 8.01-1 .......................................................................... 22

Va. Stat. § 8.2-318 ........................................................................ 24

# SUMMARY OF THE ARGUMENT

Defendants' Response does not establish their entitlement to summary judgment on all of Colbert's claims based on the Fireman's Rule ("FR") which they were improperly granted in the Trial Court, despite not requesting summary judgment on two claims, not meeting their burden under Federal Rule of Civil Procedure 56, and there being a multitude of material factual disputes.[1] Defendants leave numerous facts undisputed and actually create many other material factual disputes. Defendants raise a fact issue even as to what the defect actually is. Colbert contends it is the corrosion and leaking of highly flammable hydrogen gas. Defendants claim it is only the fire hazard (that the leaking of highly flammable hydrogen gas creates). If the parties do not agree on the nature of the defect, the entire case is a series of material disputed facts incapable of summary disposition. Like the Trial Court, they rely on outdated case law from states some of which have now abolished the FR.

Under the *Edell* guidance, where the Court "must disregard all evidence favorable to the moving party, here, [Defendants], that a jury would not be required to believe" and "should given credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and

---

[1] Rule 56(a) states in part: "A party may move for summary judgment, **identifying each claim or defense** – or the part of each claim or defense – on which summary judgment is sought." (Emphasis added.)

unimpeached, at least to the extent that the evidence comes from disinterested witnesses."[2] Here, Defendants rely almost exclusively on their own affidavit testimony (not the deposition testimony which is favorable to Plaintiff). Defendants did not properly seek summary judgment in the court below and were not entitled to dismissal of this case. But even if they had, there is a genuine issue of material fact here that the conduct on the part of Defendants not only rises to the level of gross negligence, but willful and wanton. When the proper standard of review is applied, the evidence reviewed, the legal authority analyzed logically, this Court must overturn the summary judgment granted on Colbert's claims. This is particularly true in the context of a products liability case and a case involving gross negligence or willful and wanton conduct – all intensely factual matters best left to a jury.[3]

When the legal and factual analyses are completed, the FR does not operate to bar Colbert's claims. It either does not apply to his claims at all, or the willful and wanton or gross negligence exceptions apply. He is entitled to his day in court so

---

[2] *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435-36 (4th Cir. 2001) (other citations omitted).

[3] *See Young v. J.I. Case*, 1994 WL 506403, *1 (E.D. Va. 1991) ("products liability actions are ordinarily not susceptible of summary adjudication.") (citation omitted); *see also, Baughman v. General Motors Corp.*, 627 F.Supp. 871, 878 (D.N.C. 1985); *see also, e.g., Sawyer v. C.L. Pincus, Jr. & Co., Inc.*, 83 Va. Cir. 251, *2 (2011) (other citations omitted) (willful and wanton a fact-specific inquiry with each defendant's act or omissions individually evaluated).

that he might be justly compensated for his severe, permanent injuries by the wrongdoers, not the innocent taxpayers.

## ARGUMENT

## I. FACT ISSUES CREATED, LEFT UNDISPUTED BY DEFENDANTS

Defendants' own presentation of facts raises all the disputed issues that are needed in this case, beginning with its silence as to warnings provided. Not only is the paragraph of "undisputed" facts silent as to warnings, so is the rest of the "Statement of the Case." One does not find a single fact about a warning being given that the risk of fires and leaking hydrogen existed after the HTS. Defendants also fail to address other facts set out by Colbert while creating material factual disputes in other places. The net result is that it is improper to grant summary judgment in this case.

In footnote 3, Defendants attempt to raise a fact issue, without evidence, as to the failure of the HTS to prevent the fire in this case. Again in footnote 4, Defendants submit their "belief" as to a bypass in this case. However, the expert they hired to opine on this could not do so. (JA 1194:25-1195:3.) This amounts to nothing more than a stray comment and must be ignored.

Defendants contend that "[a] crack or rupture [of] the steel tube...can only happen if the boiler is still operating and is experiencing overheating." (Defs. Br. at 5.) They continue: "It is possible, at this point, if the refrigerator is still receiving

power and operating, that hydrogen gas leaving this system could be ignited by overheated steel or a propane flame." (*Id*.) This testimony was given by Norcold through an affidavit of its long-time employee and designated corporate representative, Eric Klein. It is not the testimony of a disinterested witness.

Further, Klein is disputed by Colbert's expert, Orion Keifer, who testified that even after the refrigerator is shut off, there is still a risk of fire because fugitive gas is still leaking and only has to "find one source of ignition" to cause a fire. (JA 1291:11-1292:4.) Klein's testimony is disputed because the rupture or leaking of flammable gases can happen **<u>prior</u>** to overheating as there are two final methods of failure due to corrosion:

> First, corrosion and/or corrosion fatigue eventually penetrates through the boiler tube wall, and manifests itself as a breach in the boiler tube. Second, the corrosion products can accumulate causing a loss of flow… increasing pressure within the system. As the temperature of the boiler tube increases, the steel weakens and a rupture occurs due to the abnormally high pressure and temperature to which it is exposed.

(JA 263).

Klein's testimony minimizing the danger of hydrogen gas is also disputed: by Keifer:

> When the level gets below penetration, the hydrogen gas in the system will escape. The National Fire Prevention Association (NFPA) defines leakage of flammable gas as fugitive gas. Since hydrogen gas is extremely flammable with a very broad flammability range, missing with even a small amount of air will produce a flammable mixture. All that is needed is a competent ignition source to cause a fire…Norcold's own incident report documents, however, show that fires involving

Norcold refrigerators are still occurring even though the HTS is installed, demonstrating that shutting down the refrigerator alone does not eliminate all ignition sources for hydrogen gas. It should be noted that the methods used for installation of the refrigerator is not gas tight and cannot prevent fugitive gas (ammonia or hydrogen) from entering into living spaces.

Not only does hydrogen gas have a very broad flammability range of 4-75%, it also has a very low Minimum Ignition Energy (MIE) of approximately 0.017 mJ in air…

(JA 263-264).

Further, hydrogen has many ignition sources, not only the two Klein mentions in his affidavit.[4] Keifer agreed with the various sources of ignition that **Defendants** testified to. (JA 1092:12-19; 1093:8-12; 1093:25-1094:2; 1094:7-1095:9; 1095:17-23; 1096:17-29; 1117:17-23; JA 1298:18-1299:7.) He also described testing showing how hydrogen gas is prone to autoignition and spontaneous ignition in conditions similar to those in Norcold refrigerators. (JA 264.) Defendants agreed that autoignition was possible. (JA 1117:24-1118:1.) Defendants admitted under oath that there are numerous potential ignition sources for hydrogen and that a fire and explosion could still occur even with the HTS installed because of that. (JA 1092:12-19; 1093:8-12; 1093:25-1094:2; 1094:7-1095:9; 1095:17-23; 1096:17-19;

---

[4] The dangers of hydrogen are well-known in the public arena to be sources of explosions and fires, *e.g.*, the Hindenburg is probably the best known. The most prevalent theory for the Hindenburg's fire cause was an ***electrostatic discharge*** that ignited ***leaking hydrogen gas***. *See, e.g.,* https://www.livescience.com/58987-why-caused-the-hindenburg-disaster.html (Last retrieved August 7, 2017.)

1117:17-23.)

These admitted additional ignition sources contradict Defendants' representations that there are only two "known" ignition sources. Defendants state: "While it cannot stop all possible sources from igniting the leaking gases, the HTS was designed to stop the only **_known_** ignition source – the refrigerator itself." (Defs. Br. at 8.) (Emphasis original.) That is illogical. It cannot be the only <u>**known**</u> source if Defendants are <u>**admitting**</u> that there are <u>**other possible ignition sources the HTS was not designed to stop**</u>.

This testimony further disputes Defendants' representations that leaking highly flammable hydrogen gas presents a safety hazard only in *some* circumstances. Defendants themselves admitted under oath that hydrogen has been classified by OSHA as hazardous, and leaking highly flammable gases in an RV is dangerous and poses a safety risk which could result in death. (JA 980:12-18; 980:23-981:18; 982:6-9; 982:20-983:25; 984:1-12; 985:18-25; 1086:21-1087:2; 1087:12-15; 1090:2-8; 1090:12-15; 1116:19-24; 1117:24-1118:1; 1125:2-10; 1395:20-1396:1; 1420:21-1421:1; 1437:2-12; 1439:9-12; 1439:20-23.) Defendants' attempt to distinguish between the hazard of fire and hazard of leaking flammable gas is irrelevant; they have admitted the leaking flammable gas is itself a hazard.

While Defendants argue that the HTS was "designed" to shut off power when the refrigerator overheats to a certain temperature – below the ignition temperature

Defendants believe hydrogen has – the evidence is that there were fires still occurring even in refrigerators where the HTS was properly installed and not bypassed, which they admitted under oath.[5] (JA 1131:6-13; 1132:5-12; 1143:6-10.)

Defendants claim, without evidence, that "the evidence *suggests* that the HTS retrofit was effective in preventing fires." (Defs. Br. at 26.) (Emphasis added.) Thetford/DKM testified that it was "correct" that **"[t]he goal of preventing fires from occurring with the HTS recall…wasn't accomplished with the HTS recall" and fires can still occur even with a properly installed, non-bypassed HTS.** (JA 1131:6-13; 1132:5-12; 1143:6-10.) To reiterate, Norcold admitted that it has received "hundreds of complaints of fires after its latest recall, the HTS recall, was performed on its refrigerators." (JA 1406:19-25; 1421:10-16; 1438:2-15.) Norcold admitted that since 2010, since the last recall, there have been over a thousand reports of leaks in its refrigerators. (JA 1423:3-12.) Norcold admitted that fires have occurred due to ignition of fugitive gas leaking from its refrigerators. (JA 1436:1-4.)

---

[5] In an affidavit, Defendants claim most of these fires were from bypassed or incorrectly installed HTSs. (JA 333.) There was no source document provided for that self-interested testimony that contradicted Defendants' deposition testimony. The same is true for the contentions of Kenneth Ross (JA 1787.) Defendants also testified that they had not reviewed all of those cases where they claim bypass or installation problems and that in some cases they were unable to explain why the HTS prevented the fire. (JA 1719:23-25; 1755:20-1756:1.) Fact and credibility issues are created.

Defendants represent that Keifer testified that "the HTS has had a 'positive effect' on preventing fires, and that the refrigerators with the HTS 'potentially' are 'safer.'" (Defs. Br. at 26.) Keifer actually said, "I think it's possible" to the question of whether "the HTS monitor has reduced the number of fires in the field." (JA 293:18-294:6.) He clarified that he thinks "it's possible that it's reduced the number of fires, in other words, ignition off of a hot surface." (JA 294:3-6.) He did not say that it had had an overall positive effect or that it even eliminated that as an ignition source. (JA 294:10-12.)

Keifer's testimony was also misrepresented when Defendants claimed that he said that no manufacturer has been able to solve the problem of corrosion. (Defs. Br. at 26.) At the cited place, Keifer was asked if any manufacturer "has accomplished that goal" which was a follow up question to his explanation of good versus bad corrosion. (JA 301:3-21.) He said he was not aware that anyone had accomplished the goal of using that technique to prevent corrosion.

Defendants spend a great deal of time explaining that the redesigned units are still going to corrode and leak, in an effort to undermine Plaintiff's use of that redesign (among other things) as evidence of a safer alternative design. Defendants say they installed the HTS because of the unremedied corrosion and leaking gas. While there have been no fires reported in the redesigned units, Defendants argue there will be because there is nothing that can be done about corrosion and leaking

of highly flammable hydrogen gas. Assuming *arguendo* that what Defendants say is true, then, according to the "design safety hierarchy" that Defendants' counsel questioned Plaintiff's expert about, if you cannot design around a hazard or guard against it, you must warn about it. (JA 1300:14-1301:1.) But there is not one fact offered to show that Defendants warned of the risk of leaking highly flammable hydrogen gas or the risk of fires that exist in their refrigerators under the old design at issue in this case or the redesign. Defendants' counsel admitted this during oral argument. (JA 2014:6-9). Defendants argue about how much money they spent on investigating the issue, issuing recalls they admit were ineffective, and "notifying the public through multiple voluntary recalls," but that has nothing to do with warning people of the risks remaining in the refrigerators *after* the recall work was done – and, according to Defendants – warning people who purchase the redesigned units which will still contain the defect of corrosion and leaking of highly flammable hydrogen gas.

Moreover, Colbert disputes – with evidence – Defendants' claim that there are no safer alternative designs. Colbert submitted not just the redesign (which is all that Defendants mention) as a safer alternative design, but a whole list of safer alternative designs that Defendants did not dispute. (Pls. Br. at 34-35.) Colbert's expert also testified that certain of these these "probably would have been successful in solving

the root cause."[6] (JA 1317:13-1318:1.) Defendants' engineer described the thicker boiler tubes as a "solution." (JA 1551-1553.) These are all material factual disputes precluding summary judgment in this case.

## II. DEFENDANTS' RESPONSE ESTABLISHES THAT THEY DID NOT MOVE FOR SUMMARY JUDGMENT ON COLBERT'S FAILURE TO WARN & NEGLIGENT DESIGN CLAIMS

After sifting through the positions taken, the ultimate conclusion to be reached is that Defendants did not seek summary judgment on Colbert's failure to warn claim. First, they argue Colbert did not assert such a claim, but he set forth legal authority proving his pleading is sufficient. Defendants did not respond.

Second, Defendants claim: "Regardless, Defendants established that the Fireman's Rule bars *any* claim for negligence that Colbert may assert against Defendants, including negligent failure to warn." (Defs. Br. at 14-15.) (Emphasis original.) Later Defendants argue: "Since the Fireman's Rule bars Colbert's negligence claims, including negligent design and failure to warn, Defendants were not required to establish no genuine issues of material fact with regard to every aspect of that negligence claim since *all aspects* of that claim are barred as a matter of law." (Defs. Br. at 27, n. 11.) (Emphasis original.)

---

[6] *Brosville Cmty. Fire Dept. v. Navistar, Inc.* held that there was as genuine issue of material fact where a safer alternative design was proffered that "could have prevented or reduced" the incident and was a matter for the jury. 2014 WL 7180791, at *7 (W.D. Va. 2014). It was willful and wanton to ignore the myriad safer alternative design options.

Defendants are incorrect on the law, but this is an unqualified admission that they did not seek summary judgment on Colbert's negligence claims and did not set forth the elements they contend lack factual support in their summary judgment.

Defendants also state:

> While Defendants did address aspects of the negligent design claim in their briefing, they made clear that the argument was directed towards the Runnels' claim for negligence and not Colbert's claim. Since the Fireman's Rule bars Colbert's negligence claims, including negligent design and failure to warn, Defendants were not required to establish no genuine issues of material fact with regard to every aspect of that negligence claim since ***all aspects*** of that claim are barred as a matter of law.

(*Id*. at 27, n.11.) (Emphasis original.)

Neither of these contentions reflect the law, but they do make clear that Defendants did not seek summary judgment against *Colbert* for negligent design or against *any Plaintiff* for failure to warn. Procedurally, this highlights Colbert's arguments about the failure of Defendants and the Trial Court to follow Rule 56. This is precisely why this appeal was filed and why Colbert's reliance on *BNLFood Invs., Ltd. v. DSM Nutritional Products, LLC* is appropriate and applicable.

To the extent that the FR applies to products claims, if an exception applies showing that conduct was willful and wanton (or grossly negligence), the first responder may proceed with his claim. The idea that Defendants do not have to brief each element of each claim for which it contends it is entitled to summary judgment based on a lack of genuine issue of material fact is absurd. Where the FR might

apply, as Defendants contend it does, Defendants – as movants – must allege and show an absence of disputed material fact with regard willful or wanton conduct (or grossly negligent conduct) for each element of each claim. Defendants are not excused from Rule 56's requirements because they contend they have a FR defense.[7]

Third, Defendants contend they "addressed this claim [of failure to warn "contained within Plaintiffs' count for 'Exemplary Damages'"] in some depth in its summary judgment argument." (Defs. Br. at 15.) That is incorrect. Defendants focused on their alleged efforts to find the source of the problem they claim they could never fix, implement design changes to new units that they claim never fixed the source of the problem, and issued recalls that did not effectively address either the leaking hydrogen or the risk of fires that remained after the recall work was performed on existing units.

Next, Defendants argue "[t]he warnings claim was addressed…because…Defendants asserted warnings as one of their affirmative defenses." (Defs. Br. at 15.) Of course, the affirmative defense of warning has different elements than a claim for failure to warn. One would not argue their

---

[7] Defendants seem to argue there is some set of "willful and wanton" conduct out there separate and apart from the conduct relevant to each element of each claim. Defendants also claim Colbert's reliance on *Navistar* for the elements of a negligent design claim is misplaced because in a case involving the FR, the court does not need to consider Colbert's claims of negligence. The court is to examine the conduct relevant to each cause of action and see if that conduct rises to the level required to meet an exception to the FR, which is what the *Hudgins* and other courts have done.

affirmative defense when seeking summary judgment on one's failure to warn claim. Defendants have never provided any evidence of warnings after the recall work was performed that the risk of leaking hydrogen and fires remained. Indeed, Defendants never responded to those undisputed facts in the Trial Court.

Finally, Defendants conclude that since "warnings, or lack thereof, was before the court in the context of the competing motions for summary judgment[,] Defendants met their burden…" (Defs. Br. at 15.) That is not what Rule 56 requires or what was done here. Defendants cannot simply say that the FR applies so it is entitled to summary judgment across the board. What elements lack proof when viewing the elements from the standpoint of determining willful and wanton conduct? We still do not know. Defendants neither met their burden at the Trial Court nor here, nor was the Trial Court correct in deciding as it did with regard to failure to warn – or, as it turns out – negligent design because Defendants admit they did not seek summary judgment on that claim which has different elements than failure to warn.

## III. THE FIREMAN'S RULE IN PRODUCTS LIABILITY CASES

Defendants contend the FR should be expanded to products liability cases. Defendants rely on dated cases outside this jurisdiction for support, despite the fact that several of those jurisdictions have since abolished the FR. Then, without explanation or analysis, they conclude "the legislation recently enacted in Virginia

underscores the viability of the Fireman's Rule as a defense to products liability claims." (Defs. Br. at 17.) The fact that the FR now has four separate exceptions indicates that the legislature is limiting the application of the FR. The amendment does not extend application of the FR to either products liability or warranty claims.

Colbert provided more recent case law and analysis of the direction that the Virginia legislature has taken which is to broaden exceptions to its application. Noting the cases that are no longer good law because of the subsequent abolition of the FR, including those relied upon by the Trial Court, is very important. Not only does it demonstrate error, it demonstrates how the public policy of the FR has evolved – to a place where the public should not pay for the grossly negligent or willful and wanton conduct of a corporation which knowingly puts into the stream of commerce dangerous products.

One thing that must be remembered throughout the analysis here, particularly when looking at cases such as *Crouch*, *Millsaps*, *White v. Edmond*, *Pottebaum v. Hinds*, and *Brown v. GE*, is that the fire here was imminently preventable had Defendants remedied the defect once they knew of it or warned of the risks of it, which they knew existed after the recall work was performed and which they acknowledged was a safety hazard. These very unique facts set this case far apart from almost every other case involving the application of the FR. Even in the cases cited by Defendants, there was no evidence or claim that the defect in the particular

products was well-known, acknowledged to exist, but unremedied. Nor were there facts alleged that a "remedy" was issued that was inherently ineffective. Nor was it alleged that an ineffective retrofit was offered, the danger remained after the retrofit, and that danger concealed,[8] all the while the consumers were being told the product was now safe. There are simply no cases with facts this egregious. The Court in *Lockhart* agreed "with the Magistrate Judge that the Virginia courts would not expand this rule to bar this plaintiff's claim because the fireman's rule does not contemplate a person in Plaintiff's position." 2003 WL 22097984, at *3 (W.D. Va. 2003). The Magistrate's Recommendation made that statement after a review of exceptions to the FR and circumstances where it was not applied, not just from the plaintiff's position. *Lockhart v. Coastal Coal Co.*, 2003 WL 22076561, at *4 (W.D. Va. 2003).

*Goodwin v. Hare*, cited by both parties, noted that the cost of injuries to first responders should not be borne by the public where there is intentional conduct by someone which causes the injuries. (Pl. Br. at 18-19.) That was an early indication that the FR would not save all wrongdoers from the consequences of their actions.

Defendants are dismissive of *Green v. Consolidated Freightways* as "*dicta*," ignoring its definition. The court considered whether "the Plaintiff alleged that the

---

[8] There is no monitor for leaking hydrogen – no gauges, beeps, lights, or anything that would warn a consumer that this flammable gas is escaping. Consumers are not warned to have the tube routinely inspected for corrosion and leaks.

truck was defective in some regard, causing Greene to fall." 74 F.Supp.2d 616, 621 (E.D. Va. 1999). Courts do not make random, superfluous, irrelevant remarks. They take the reader through their analysis and explain how they arrive at their conclusions for the benefit of those using the cases later. The mention of the absence of defect was purposeful. Here, the record is replete with evidence that Defendants caused the fire here through not addressing the defects or warning of the risks inherent in the unremedied defect: leaking gas which could lead to fires. Colbert was injured as a direct result.

There is no precedent in Virginia for expanding the FR to products liability cases. The amendment does not change the fact that the FR does not expressly apply to anything but negligence in the absence of the enumerated exceptions. The cases from other states that Defendants cited, including those in footnote 17 provide no persuasive authority either particularly under these circumstances. *Armstrong v. Mailand*, is no longer good law as Minnesota abolished its FR in 1992. *See* Minn. Stat. Ann. §604.06. This was actually mentioned in *White v. Edmond* upon which both the Trial Court and Defendants rely. 971 F.2d 681, 688, n.5. *Mahoney v. Carus Chem. Co.*, a New Jersey case, is of no use here because New Jersey abolished its FR as noted in *Ruiz v. Moreno* which listed a number of states that had abolished the FR. 189 N.J. 525, 533 (2007). In keeping with the modern trend of reducing the reach of the FR and allowing first responders their rights to seek redress from those

that caused their injuries, this Court should not expand the FR, especially in light of the fact that by codifying existing exceptions and adding additional ones, the Virginia legislature is clearly contracting its application.

## IV.  DEFENDANTS' WILLFUL & WANTON (AND GROSSLY NEGLIGENT) CONDUCT

Should this Court apply the FR to products cases, the exceptions apply. Defendants claim that they because they spent a sum of money "in response to the product defect" their conduct cannot possibly be found to be willful and wanton and that exception to the FR cannot be met because they exercised "some care." None of this is accurate. Neither the cases cited by Defendants nor the facts in this case support summary judgment.

That Defendants instituted a number of recalls and allege they spent millions (there is no record evidence of this other than a self-serving affidavit by a long-time employee) is irrelevant when they exercised no care at all to remedy "the danger." The danger here was not overheated boiler tubes, which is all the HTS really address if it worked at all. The danger here is leaking flammable gas that can be ignited by any number of sources, including auto-ignition (an undisputed, admitted fact), electrostatic shocks (an undisputed, admitted fact). The defect here is leaking flammable gas, which Defendants admit (and only dispute later by creating a fact issue between the persons who testified as corporate representatives in deposition and their affidavits). It is also undisputed that the HTS does not prevent fires because

the HTS does nothing to stop the leaking of this highly flammable gas, which is the defect, the danger, which was never addressed by any recall or warning. There were also safer alternative designs available which Defendants did not utilize, knowing the danger they were leaving unremedied.

Defendants only remedied leaking gas through the 2012 redesign (that they now argue had nothing to do with safety), which only emphasizes how willful and wanton the conduct is that resulted in the harm to Plaintiffs because Defendants knew of the defect, have a duty to remedy the defect[9], have a solution to the defect, but then failed to remedy in the subject refrigerator, all the while concealing the danger. Defendants exercised no care with regard to their defective refrigerators for customers with pre-2012 model refrigerators since 2010 (which includes the subject refrigerator). There is no evidence that Defendants exercised any care to remedy "the danger" (of leaking highly flammable gas) for customers who own Norcold refrigerators that pre-date the 2012 redesign despite knowing of the danger, concealing the danger from their customers (including Mr. Runnels), and failing to warn of it.

In *Philip Morris v. Emerson* the issue was whether "reasonable care was being

---

[9] *See General Motors v. Lupica* which held "[w]hen a defendant has notice and actual knowledge of a defect, it owes a duty to a plaintiff 'to take the steps reasonably necessary to remedy the defect.'" 237 Va. 516, 521 (1989).

given to **the danger**."[10] 235 Va. 380, 408-09 (1988). (Emphasis added.) Here, "the danger" is the corrosion and leaking of highly flammable gases which creates a risk of harm to consumers and about which consumers were not warned – both of which are undisputed facts. Defendants now argue the risk is of fire and they implemented the HTS problem to address two potential ignition sources for the leaking gas to try to prevent fires. Even were that true, they provide no evidence that they warned about the remaining of fire risk which they also admitted under oath continued after the retrofit was completed. They also admitted under oath that fires continued with perfectly installed HTSs and about which they did not warn or further address.

Defendants also relied upon *Ford Motor Co. v. Bartholomew*, 224 Va. 421 (1982), but the facts there render the case and holding inapposite. In that case, the plaintiff focused on the cost[11] of the modification that she asserted should have been made. *Id.* at 436-37. Moreover, the modification she championed was tested and found to have problems that would not resolve the concern.

---

[10] Texaco and Philip Morris were determined not to be willful and wanton because they acknowledged "the danger" posed by the chemicals exposed, buried them, marked them on a map, and there was supervision provided. The harm was not concealed or ignored. One defendant was found to be willful and wanton as he knew the contents of the containers, knew the risk they posed, and he exposed people to them.

[11] Defendants focus on cost, but that is not the sole focus (or even primary or secondary focus) of Colbert's willful and wanton analysis. It is the knowledge of the defects, how they should have been fixed, the failure to remedy the defect, the ineffective recall, the lack of warnings, and so much more that makes up the willful and wanton and gross negligence analysis.

Defendants rely on *Hudgins v. Holman* and try to fit the facts of this case into it because willful and wanton conduct was not found. 49 Va. 279 (1999). Defendants note that a **warning** was placed on the boom among other steps taken to remedy the specific risk there. *Id*. at *7. The Court also emphasized that it looks at "the state of mind of the tortfeasor" to determine whether the otherwise negligent conduct rose to the level of willful and wanton or gross negligence so as to defeat the FR. *Id*. at *7. It found that the operator "was not aware that this act would produce conditions which could result in great harm or death." *Id*.

Defendants also rely on *Burke v. Deere & Co*., where the Court found the conduct alleged there did not rise to the level of willful and wanton conduct where, *inter alia*, **there actually were warnings provided**. 6 F.3d 497, 504 (8th Cir. 1993). There were general warnings about the machine in the owner's manual and a decal at the time of manufacture and sale. *Id*. After certain injuries using the auger were reported to the company, post-manufacture, post-sale, but pre-accident, the company sent out additional "retrofit decals" about the specific danger provided to customers. *Id*. The decals were put near the area of danger. *Id*. It is hard to fathom how this case does anything but contrast with the facts in this case where there was no "retrofit decal" or warning about dangers inherent in the refrigerator even after the recall work was performed. Indeed, *Burke* demonstrates why Defendants' conduct rises to the level of willful and wanton. Interestingly, the *Burke* Court held that "the warning

issue is relevant to the existence of a dangerous defect…” *Id*. at 505. Again, as stated above, the evidence here creates genuine disputes of material fact to the extent willful and wanton conduct is not established as a matter of law.

Defendants claim they did not have to warn of leaking gas because the real hazard is the fire. They point to the language of the recall notices which warned customers that if they did not have the recall work done, they were at risk of fires. But the failure to warn claim here is based on Defendants never warning that the **risk** of leaking gas **and** fires **remained** after the HTS work was performed because leaking gas still occurred and could still be ignited by a number of sources – including the refrigerator itself – as Defendants admitted. To the extent that the parties disagree on the true nature of the defect, that is a fact issue created by Defendants. To the extent that Defendants cite to testimony where they walk back those answers regarding the effectiveness of the HTS, those are additional fact issues created by Defendants. The cases cited by Defendants are of no moment because there was no post-recall warning here about the remaining dangers. Defendants provide no evidence to the contrary leaving this an undisputed material fact. **They exercised *no care* in warning about these post-recall dangers that they knew existed.**

Defendants testified they knew that leaking highly flammable hydrogen gas was itself a safety hazard that could lead to serious injury and death, had many

ignition sources, the HTS (at best) only addressed two potential sources, was not entirely effective, that they chose not to address the defect of leaking gas until the redesign, but did nothing for existing refrigerators with that defect, chose not to warn customers that the risks of leaking gas *and* fires remained after the HTS was installed, and told customers that the refrigerators were safe after the HTS was installed *knowing* that was not true. Defendants have admitted to all of these facts, establishing by their own sworn testimony, willful and wanton conduct, or a conscious knowledge that injury would probably result from their choice to not remedy the defect or warn of it. To the extent Defendants try to dispute their own testimony now, they create fact and credibility issues requiring a denial of summary judgment.

## V.   THE FIREMAN'S RULE AS AMENDED

Defendants spend three pages arguing that the amendment did not abrogate the FR. Colbert did not argue otherwise. Title 8.01 explicitly intends retroactive application of the amendment unless the change affects the substantive rights of a party or would cause a miscarriage of justice. Defendants did not argue the latter. The codified exceptions applicable to this case were already present in the common law and are **not** a material change of a substantive right. Colbert has a right of action, a remedial right, to presently enforce a cause of action and the amendment prescribes methods by which he may obtain redress or enforce his rights. The codification

clarifies that the Virginia legislature intends that gross negligence also be an exception to the application of the Fireman's Rule, which *Hudgins* held as well. Defendants do not state how allowing a gross negligence exception creates a new right, duty, or obligation or what that new right, duty, or obligation is. The amendment should apply.

The facts and law set forth above raise many material factual disputes as to Defendants' willful and wanton conduct. Because gross negligence is a lower standard, which Defendants admit, those same facts certainly establish that level of misconduct on their part. Neither *Elliott v. Carter* (addressed in Colbert's opening brief) nor *Murray v. Correct Care Solutions, LLC* changes the facts in this case – Defendants showed no care in warning of the remaining risks of leaking hydrogen gas or fire after the recall work was done and showed no care in addressing the admitted defect of leaking gas which they had a duty to remedy once they discovered it. In *Murray*, a Rule 12(b)(6) ruling, there was evidence that the inmate's medical condition was addressed in some manner. 2017 WL 214189, at *3 (E.D. Va. 2017). The same cannot be said here.

## VI.   COLBERT'S WARRANTY CLAIM

Defendants did not address Colbert's warranty claim in their MSJ until their Reply. They now admit that they did not argue the FR in the context of the warranty claim. Defendants **only** argued disclaimer. Colbert reiterates that the warranty was

not disclaimed because of Defendants' unconscionable conduct. Defendants never disclosed the defect to Winnebago or the Runnels at the time of sale when, by that time, they knew of leaking flammable gas in their refrigerators. Defendants provide no evidence that they warned purchasers of the defective nature of this refrigerator, despite being the party with the superior knowledge. This created the unequal bargaining power. Defendants failed to provide evidence of a **contract of sale** with the statutorily required language and failed to address this argument. They did not effectively disclaim warranty.

Colbert also reiterates his argument here that he was "affected by" the refrigerator which is not the same as using or consuming the product. The "affected by" language is not to be construed as superfluous or redundant of the prior terms. No case cited by the Trial Court addressed this term. However, Defendants do cite cases that answer the question in Colbert's favor beginning with *Nacci v. Volkswagen of America, Inc.*, 325 A.2d 617 (Del. Sup. Ct. 1974). The court held that a child injured by a vehicle while riding his bike could bring a claim under §2-318 as the child was one reasonably expected to be "affected by" the vehicle as vehicles were reasonably expected to come into contact with other vehicles and pedestrians.

In this case, Colbert, **because he is a first responder**, would reasonably be expected to be affected by this product which has been a fire hazard for decades. Moreover, the manufacturer claims it can do nothing about the fire hazard itself –

the leaking flammable gas – which causes fires even in its products with the retrofit. The manufacturer further claims that even its redesigned unit with thicker boiler tubes will eventually leak hydrogen gas which will cause more fires because not all fires have been prevented by the HTS which the manufacturer admits. Thus, it should reasonably be expected that first responders are within that class of people who are affected by the defective product. It is not fit for its ordinary purpose. The reasoning in *Wasik v. Borg* and *Mosely v. Wyeth, Inc.*, cited by Defendants, are consistent as well. *Mosely* made it clear that the "affected by" language was for those injured by a product who had not purchased, used, or consumed it, which was not the case for that plaintiff. 719 F.Supp.2d 1340, 1350 (S.D. Ala. 2010).

Defendants did not seek summary judgment on Colbert's warranty claim and now admit that they did not argue that the FR precluded it. This emphasizes the Trial Court's error in granting them summary judgment on this claim and on this basis. This Court should reverse on this basis. And, should this Court address the merits of this argument made for the first time on appeal, to the extent the FR would apply to a warranty claim (and Colbert argues it would not for the reasons set forth above in the products liability discussion), the exceptions to the FR apply for the same reasons.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the Order granting summary judgment in Defendants' favor and vacate and remand this case for trial.

Respectfully submitted,

**For the Appellant:**

/s/ *Kassi Dee Patrick Marks*
BRADLEY L. LEGER
KASSI DEE PATRICK MARKS
**LEGER KETCHUM & COHOON, PLLC**
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
Tel:  832.764.7200
Fax: 832.764.7211
bleger@lkclawfirm.com
kmarks@lkclawfirm.com

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
**Effective 12/01/2016**

No. 17-1419    **Caption:** Brian Colbert, Plaintiff-Appellant, v. Norcold, Inc., et al

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains _____6,481_____ [state number of] words

[ ] this brief uses monospaced type and contains _____ [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 15.14 [identify word processing program] in 14 point Times Font [identify font size and type style]; or

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [identify word processing program] in _____ [identify font size and type style].

(s) Kassi Dee Patrick Marks

Party Name Brian Colbert, Plaintiff-Appellant

Dated: August 11, 2017

[ Print ]    [ Save ]    [ Reset Form ]       11/14/2016  SCC

## CERTIFICATE OF SERVICE

I certify that on August 11, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the address listed below:

Martin A. Conn
Lisa M. McMurdo
Laura May Hooe
MORAN REEVES & CONN PC
100 Shockhoe Slip, 4th Floor
Richmond, Virginia 23219

*Counsel for Appellees*

/s/ *Kassi Dee Patrick Marks*
Kassi Dee Patrick Marks